**Michael Grinblat** (4159752)
Law Offices of Michael Grinblat
10 East 39th Street, 12th Floor
New York, NY 10016
Tel: (347) 796-0712
Email: michael.grinblatesq@gmail.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LEONID TREYGER**, | **PLAINTIFF'S STATEMENT OF MATERIAL FACTS** |
| Plaintiff, | |
| -against- | |
| **GIO WINE & SPIRITS CORP., GBA 526 LLC**, | **CASE NO.: 23-cv-2099-HG** |
| Defendants. | |

## PREAMBLE

LEONID TREYGER (the "Plaintiff"), by and through his attorneys, in conjunction with his Motion for Summary Judgment against Defendants GIO WINE & SPIRITS CORP. and GBA 526 LLC ("GBA"), in compliance with Local Rule 56.1 and Individual Practice Rules of Judge Hector Gonzalez, contends that there is no genuine issue as to the below facts.

## PLAINTIFF'S FACTUAL ALLEGATIONS

1. Plaintiff has been diagnosed with multiple sclerosis by his treating neurologist. [Affidavit of Plaintiff Leonid Treyger ("APLT"), Exhibit 1, at ¶ 1]

2. This neurological condition affects Plaintiff's control of muscles in his legs. Plaintiff cannot balance well on his own two feet, has difficulty standing and cannot walk. [APLT, Exhibit 1, at ¶ 2]

3. Plaintiff's neurologist prescribed him a motorized mobility scooter ("Motorized Scooter"). [APLT, Exhibit 1, at ¶ 3]

4. Plaintiff uses his Motorized Scooter for mobility everywhere, including inside his apartment. [APLT, Exhibit 1, at ¶ 5]

5. Plaintiff uses his Motorized Scooter every day for all activities requiring mobility. [APLT, Exhibit 1, at ¶ 6]

6. For Plaintiff to enter a store, a ramp leading to its entrance must be properly sloped, its landings must be level, it must be sufficiently wide, its surface must not have cracks, holes or other hazards that can pose danger of catching the wheels of his Motorized Scooter, causing its tipping and his falling from it. [APLT, Exhibit 1, at ¶ 9]

7. In May 2021 Plaintiff attempted to enter and shop inside of the store Gio Liquors, located at 48-01 108th Street, Corona, NY. [APLT, Exhibit 1, at ¶ 11]

8. On May 20, 2021, Plaintiff attempted to enter and shop inside of the store Gio Liquors. [Exhibit 10]

9. The store Gio Liquors has only one entrance. [APLT, Exhibit 1, at ¶ 12]

10. There is a ramp leading to the store's entrance. [APLT, Exhibit 1, at ¶ 13]

11. That ramp reaches a height of at least 15 inches above the ground. [APLT, Exhibit 1, at ¶ 15]

12. Other than by riding up the ramp, there is no way for Plaintiff to enter the store Gio Liquors. [APLT, Exhibit 1, at ¶ 16]

13. In May 2021 Plaintiff wanted to make a purchase inside the store Gio Liquors. [APLT, Exhibit 1, at ¶ 38-39]

14. When Plaintiff started riding up the ramp, he realized that it was very steep and that it would be dangerous to continue riding all the way to its top. Plaintiff was afraid that his Motorized Scooter would tip over and fall backwards, causing him to suffer a serious and potentially fatal injury. [APLT, Exhibit 1, at ¶ 41]

15. Having realized that he would not be able to enter the store by riding up the ramp, Plaintiff tried to find another entrance, which would be accessible to disabled people. [APLT, Exhibit 1, at ¶ 43]

16. Plaintiff rode around the corner of the building, in which the store is located, onto 48th Avenue, to see whether there was another entrance to the store there. [APLT, Exhibit 1, at ¶ 44]

17. Plaintiff realized that there is no other entrance to Gio Liquors on 48th Avenue. [APLT, Exhibit 1, at ¶ 45]

18. Plaintiff then tried to see whether there was another entrance to the store on 108th Street. [APLT, Exhibit 1, at ¶ 46]

19. Plaintiff realized that there was no other entrance to the store on 108th Street and that the only way to enter the store Gio Liquors was by riding up the ramp. [APLT, Exhibit 1, at ¶ 47]

20. Plaintiff then tried to find a way to get attention of a store's employee in hope of requesting that employee for assistance with buying what he wanted in the store. [APLT, Exhibit 1, at ¶ 48]

21. There was no buzzer outside of the store, which Plaintiff would have been able to press to call attention of a store's employee. [APLT, Exhibit 1, at ¶ 49]

22. Plaintiff also did not observe any other device located near the entrance to Gio Liquors, which would have allowed him to alert the store's employee of his need for assistance. [APLT, Exhibit 1, at ¶ 50]

23. Plaintiff then looked inside the store's windows to see whether there were any instructions on how to alert a store's employee. [APLT, Exhibit 1, at ¶ 51]

24. There was no sign in Gio Liquors' windows with instructions for disabled visitors on how to alert the store's employee of their need for assistance. [APLT, Exhibit 1, at ¶ 52]

25. Plaintiff then tried to find instructions on how to alert the store's employee by looking for a sign on the walls of the building in which Gio Liquors is located. [APLT, Exhibit 1, at ¶ 53]

26. Plaintiff realized that there was no sign with instructions on the store's walls. [APLT, Exhibit 1, at ¶ 54]

27. Not being able to enter the store by riding up its ramp to its only entrance, and not being able to alert the store's employee of his need for assistance, Plaintiff realized that he would not be able to buy anything in the store without assistance. [APLT, Exhibit 1, at ¶ 55]

28. Consequently, Plaintiff requested someone to purchase for him an item he wanted to buy at the store. [APLT, Exhibit 1, at ¶ 56]

29. That person agreed to help Plaintiff and walked up the ramp leading to Gio Liquors' entrance, entered the store, bought the item Plaintiff wanted, obtained a receipt, exited the store, walked down the ramp, and gave both the item and the receipt to Plaintiff. [APLT, Exhibit 1, at ¶ 57]

30. Plaintiff intends to visit Gio Liquors again in the future when he visits Flushing Meadows Corona Park, purchase items offered for sale in it and enjoy its services as soon as the architectural barriers are removed. [APLT, Exhibit 1, at ¶ 65]

31. Plaintiff cannot shop in the store Gio Liquors until the architectural barriers are removed, because he cannot enter it. [APLT, Exhibit 1, at ¶ 66]

## SUPPLEMENTAL AFFIDAVIT OF MARCIA ESQUENAZI

32. On both August 20 and October 20, 2023, Plaintiff's expert witness, architect Ms. Marcia Esquenazi examined the ramp, the sole entrance to the store Gio Liquors. [Supplemental Affidavit of Marcia Esquenazi, Architect, Plaintiff's Expert Witness ("Architect's Aff.") Exhibit 2, at ¶ 4]

33. The ramp has an intermediate landing platform that is at a height that ranges from 15 inches to 18 inches above the sidewalk. There is an upper landing at the store entrance door as well as a cross slope to the door, which adds 2 - 5 inches for a total of approximately 20 inches above the sidewalk. From the sidewalk to the intermediate landing, the ramp is steep and dangerous, with a slope greater than 1:12, in violation of the ADA. [Architect's Aff., Exhibit 2, at ¶ 5]

34. The intermediate landing has a slope of 8.4%, equivalent to 1:11, in violation of 1991 Standards §4.8.2, 1991 Standards §4.8.4, and 2010 Standards §405.7.1. [Architect's Aff., Exhibit 2, at ¶ 18]

35. The store's ramp run, at certain points, has a slope of 27.3%, equivalent to 1:3.66, in violation of both 1991 Standards §4.8.2 and 2010 Standards Table §405.2. [Architect's Aff., Exhibit 2, at ¶ 13]

36. The ramp has no handrails. [Architect's Aff., Exhibit 2, at ¶ 25]

37. There is no handrail extending beyond the bottom of the ramp, in violation of 1991 Standards §4.8.5 and 2010 Standards §505.10.1. [Architect's Aff., Exhibit 2, at ¶ 27]

38. Approximately in 2001, there was a change in use of the commercial property located at the same address as Gio Liquors. A laundromat was converted into the present day liquor store. [Architect's Aff., Exhibit 2, at ¶ 31]

39. Between 2001 – 2013 there were modifications/alterations to Gio Liquors. Floor to ceiling security partitions, bullet proof glass doors, counters and shelves were installed. [Architect's Aff., Exhibit 2, at ¶ 31]

40. Remediation of ADA violations may be accomplished by addition of metal handrails to the ramp at a cost of approximately $1,800. [Architect's Aff., Exhibit 2, at ¶ 32]

41. The ramp's slope can be reduced to less than 8.4%. That can be accomplished by the addition of concrete and scarification of the existing ramp and landing. Construction is expected to be completed within two days and cost approximately $2,000. [Architect's Aff., Exhibit 2, at ¶ 33]

42. The cost of construction of an ADA-compliant ramp, as depicted in the architectural drawings, would cost approximately $8,900. [Architect's Aff., Exhibit 2, at ¶ 34]

### SECOND SUPPLEMENTAL AFFIDAVIT OF MARCIA ESQUENAZI

43. To make the path of travel to the front entrance door of the store Gio Liquors, located at 48-01 108th Street, Corona, NY, more accessible for people with disabilities, an electrical door assist may be installed, as specified in the 2022 NYC Department of Buildings ("DOB") Code §1101.5.8 entitled Automatic Doors. [Second Supplemental Affidavit of Marcia Esquenazi, Architect, Plaintiff's Expert Witness ("Architect's Aff. 2") Exhibit 9, at ¶ 1]

44. An electric door assist opens a door in the ingress and egress by electric power, by means of a user pressing on a door button. Through use of electric door assist it is possible to both bypass necessity of doing construction to change the configuration of the front entrance door and to bypass the necessity to comply with the clearance requirements of 18 inches and 24 inches of the latch side of the door. *See* 2022 NYC Dept of Buildings Code § 1101.5.8 Automatic Doors. The cost of an electric door assist is approximately $400. [Architect's Aff. 2, Exhibit 9, at ¶ 2]

45. The existing ramp is steep. It has a slope ratio of approximately 1:6, in violation of the ADA Guidelines and both the NY State Building Code and the NYC Building Code. The steepness of the existing ramp at a slope ratio of 1:6 is dangerous to both able bodied and disabled individuals. [Architect's Aff. 2, Exhibit 9, at ¶ 3]

46. The City of New York Mayor's Office of People with Disabilities, the DOB, and the NYC Department of Transportation ("DOT") recognize through review of field conditions and by providing application process for waivers of code requirements it is possible to install ramps that are compliant with the ADA Guidelines and city agency codes. [Architect's Aff. 2, Exhibit 9, at ¶ 4]

47. Mr. Demetry fails to disclose information regarding existence of additional DOB Code provisions that outline how The City of New York Mayor's Office of People with Disabilities, the DOB, and DOT have addressed and implemented rules and regulations to maximize the ability to install sidewalk ramps to accommodate people with disabilities and to accommodate site conditions requiring waivers. 2022 NYC Building Code § 3202.2.2.1 Ramps makes reference to Chapter 11 of the Code. Mr. Demetry fails to mention that § 1101.3.5 of the Building Code describes special provisions for waiver of Code

requirements that allows for approval of construction of the proposed ramp and §
1101.3.5.1 describes the application process. § 1101.3.5.2 describes waiver of
recommendations. § 1101.4 is regarding alterations affecting area of primary functions.
[Architect's Aff. 2, Exhibit 9, at ¶ 6]

48. After construction of the proposed ramp on 108th Street and on 48th Avenue there will be
sufficient clear width distances of 13 feet and ten feet, respectively, on the sidewalks for
pedestrian traffic that complies with the requirements set forth by the DOT. According to
the DOT Street Design Manual, sufficient clear width sidewalk distances are met at eight
feet or at a distance that is half the distance from the building property line to the curb. On
108th Street there is 18 feet of distance from the property line to the curb, making half the
distance nine feet which is greater than eight feet. On 48th Avenue there is 15 feet of
distance from the property line to the curb, making eight feet greater than half the distance,
7.5 feet. After construction of the proposed ramp with a 43" x 60" landings, or after its
construction with 60" x 60" landings, on 48th Avenue there will be at least ten feet of
sidewalk space for pedestrians from the building line to the curb. On 108th Street there will
be at least 13 feet of sidewalk space for pedestrians from the building line to the curb.
[Architect's Aff. 2, Exhibit 9, at ¶ 7]

49. These clear width distances on the sidewalk satisfy both the DOB and DOT requirements
and present no impediment to approval of the construction of the proposed ramp.
[Architect's Aff. 2, Exhibit 9, at ¶ 8]

50. The proposed ramp meets the criteria required by the DOB and the DOT to consider a
waiver to allow construction of the proposed ramp based upon the existing dimensions of
the sidewalk. [Architect's Aff. 2, Exhibit 9, at ¶ 9]

## AFFIDAVIT OF VAL DOBROVA

51. General contractor Val Dobrova both reviewed and relied upon the ramp dimensions specified in the architectural drawings of the architect, Marcia Esquenazi, for the building of a ramp leading to the entrance of the store Gio Liquors. [Affidavit of Val Dobrova, General Contractor, Plaintiff's Expert Witness ("General Contractor's Aff.") Exhibit 3, at ¶ 3]

52. Completion of this project will take three business days and involve two workers. [General Contractor's Aff., Exhibit 3, at ¶ 4]

53. Construction of the ramp will cost $13,200. [General Contractor's Aff., Exhibit 3, at ¶ 5]

## AFFIDAVIT OF ACCOUNTANT ALINA RITS

54. Ms. Alina Rits, C.P.A., reviewed IRS Form 8826 and researched the IRS Disabled Access Credit tax credit in connection with remediation of violations of the ADA. [Affidavit of Alina Rits, C.P.A., Plaintiff's Expert Witness ("CPA's Aff.") Exhibit 4, at ¶ 11]

55. If a store owner or building owner spends $13,700 to remediate the ADA violations and then applies for and is granted the IRS Form 8826 Disabled Access Credit Tax Credit, then that entity will effectively spend $8,700 dollars on such remediation with the benefit of this tax credit. [CPA's Aff., Exhibit 4, at ¶ 12]

## DEPOSITION AND REPORT OF DEFENDANT GBA'S EXPERT WITNESS HANY DEMETRY

56. On December 29, 2023, GBA's expert witness, Mr. Hany Demetry of Sotir Associates, an NYS Registered Architect, provided sworn testimony at a deposition conducted by Mr. Daniel Berke, Esq., Plaintiff's attorney.

57. Mr. Demetry has 8.5 years of architectural experience. [Deposition of Mr. Hany Demetry, Architect, GBA's Expert Witness ("Demetry's Dep.") Exhibit 5, Page 32, Lines ("L.") 4 – 8]

58. On November 7, Mr. Demetry conducted a site inspection of Gio Liquors. [Demetry's Dep., Exhibit 5, p. 16, L. 11 – 18]

59. During his site inspection, Mr. Demetry examined the store's ramp ("Ramp"), which in his own words, provides the "only path of travel to the store." [Demetry's Dep., Exhibit 5, p. 219, L. 16 – 21]

60. Mr. Demetry testified that under the 1991 and 2010 ADA Standards for Accessible Design Title III Regulations ("ADA Guidelines") the running slope of an exterior store ramp should have a ratio of 1:12. [Demetry's Dep., Exhibit 5, p. 114, L. 4 – 7]

61. Mr. Demetry testified that the Ramp does not comply with the ADA Guidelines, because its "slope is too steep" and it is "almost double what the ADA recommends, with a slope ratio of almost 1:6."  [Demetry's Dep., Exhibit 5, p. 114, L. 21 – 24]

62. Mr. Demetry testified that the Ramp does not comply with the ADA Guidelines because "it's missing a handrail", as well as because the Ramp's landing is neither flat nor level and has different heights ranging "between 15 and 16 inches and up to 18 inches." [Demetry's Dep., Exhibit 5, p. 120, L. 17 – 25; p. 121, L. 2 – 9]

63. Mr. Demetry testified that the Ramp is unsafe and does not comply with the ADA Guidelines because it poses a safety risk that a wheelchair user "may fall backwards", "hit their head" and "hurt themselves." [Demetry's Dep., Exhibit 5, p. 112, L. 9 – 12; p. 114, L. 4 – 25; p. 116, L. 2 – 20]

64. Mr. Demetry testified that walking down the Ramp is "too steep" and "not safe" for people using walkers, because "they're being pulled down by gravity." [Demetry's Dep., Exhibit 5, p. 116, L. 21 – 25; p. 117, L. 2 – 12]

65. Mr. Demetry testified that the Ramp does not comply with the ADA Guidelines because it is missing a curved handrail at the bottom, which is a "safety addition" for people with "a sight disability." [Demetry's Dep., Exhibit 5, p. 136, L. 7 – 23]

66. Mr. Demetry testified that there is a "problem of not having clearance" by the door, in violation of the ADA Guidelines; "the door should not push in" and "should push out of the store." [Demetry's Dep., Exhibit 5, p. 122, L. 15 – 25; p. 123, L. 2 – 24]

67. Mr. Demetry testified that to resolve the problems of insufficient door clearance, installation of an "electronic push button, and the door open[ing] like a door assist" "could solve the problem of not having clearance by the door." [Demetry's Dep., Exhibit 5, p. 124, L. 7 – 20]

68. Mr. Demetry testified that it is "an important goal to make this ramp more safe" by making it "less steep." [Demetry's Dep., Exhibit 5, p. 126, L. 12 – 25, p. 127, L. 2 – 3]

69. Mr. Demetry testified that it is an important goal to make the Ramp "more safe" by adding a handrail and by making the landing "closer to level" to avoid "causing physical bodily harm" to individuals. [Demetry's Dep., Exhibit 5, p. 127, L. 4 – 7; p. 125, L. 16 – 25; p. 127, L. 2 – 7]

70. Mr. Demetry does not know the date of construction of the Ramp. [Demetry's Dep., Exhibit 5, p. 118, L. 7 – 10]

71. Mr. Demetry testified that on July 24, 2012, the NYC Department of Buildings ("DOB") approved an application for "Alteration Type 2" construction work at the store Gio Liquors

under Job # 420596778 regarding store alterations, which involved the addition of floor to ceiling security partitions, an HVAC unit, and a bulletproof glass door. [Demetry's Dep., Exhibit 5, p. 190, L. 25; p. 191, L. 2 – 25; p. 192, L. 2 – 25; p. 193, L. 2 – 25; p. 194, L. 2 – 12, p. 218, L. 17 – 25; p. 219, L. 2 – 11]

72. Mr. Demetry testified that the DOB considers the date of completion of construction work as the date "it is signed off" by the DOB. [Demetry's Dep., Exhibit 5, p. 209, L. 17 – 25]

73. Mr. Demetry testified that the application for store's alterations was approved by the DOB on July 24, 2012, and was finally "signed off" as completed by the DOB on May 21, 2013. [Demetry's Dep., Exhibit 5, p. 205, L. 7 – 19]

74. Mr. Demetry testified that according to the ADA Guidelines "the date of an alteration is the last date that it was approved by a local building department." [Demetry's Dep., Exhibit 5, p. 227, L. 3 – 9]

75. During Mr. Demetry's site inspection on November 7, 2023, he visually observed the store's floor to ceiling security partitions and bulletproof glass door as listed in the DOB application approved on July 24, 2012. [Demetry's Dep., Exhibit 5, p. 193, L. 2 – 25; p. 194, L. 2 – 12]

76. Mr. Demetry testified that the floor to ceiling security partitions changed the store's useable space "by blocking off customer's access" to the space on the other side of the partitions, where "most of the space is devoted to the sales personnel and the storage of liquor behind the partitions." [Demetry's Dep., Exhibit 5, p. 198, L. 22 – 25; p. 199, L. 2 – 25; p. 200, L. 2 – 19]

77. Mr. Demetry testified that the floor to ceiling security partitions "changed the selling space of the store" with "more than 60% of the space … devoted to the storage of liquor and the

sales personnel behind the partitions" and 40% of the store being useable by customers. [Demetry's Dep., Exhibit 5, p. 194 – 200]

78. Mr. Demetry testified that he reviewed an index card from the New York City Housing Preservation and Development from 1938, which indicated that the store was previously an open layout from 1938 until its alteration in 2001 – 2013. He also testified that due to the alterations, usable space for customers was closed off, resulting in approximately 60% of the store space being inaccessible to customers and leaving approximately 40% of the store space useable by customers. [Demetry's Dep., Exhibit 5, p. 198, L. 22 – 25; p. 199, L. 2 – 25; p. 200, L. 2 – 19; p. 201, L. 12 – 25; p. 202, L. 2 – 25; p. 203, L. 2 – 25; p. 204, L. 2 – 6]

79. Mr. Demetry testified that a liquor store's sales area is a "primary function area," as defined by § 202.4 of the 2010 ADA Guidelines. [Demetry's Dep., Exhibit 5, p. 206, L. 4 – 25; p. 207, L. 2 – 25; p. 208, L. 2 – 17]

80. Mr. Demetry testified that it is an alteration to a store if the alteration of floor to ceiling security partitions cuts off approximately 40% of the store space accessible to customers, changes its selling space, and "changes the behavior of the clients inside the store." [Demetry's Dep., Exhibit 5, p. 195, L. 2 – 25]

81. Mr. Demetry testified that the Ramp is the "only path of travel to the store." [Demetry's Dep., Exhibit 5, p. 219, L. 16 – 21]

82. Mr. Demetry testified that the overall cost of the alterations in the store, that were "signed off", i.e. completed, in 2013, was $48,690. [Demetry's Dep., Exhibit 5, p. 222, L. 13 – 22]

83. Mr. Demetry testified that by his calculation 20% of the overall cost of the alterations in the store of $48,690 equals $9,738. [Demetry's Dep., Exhibit 5, p. 224, L. 2 – 7]

84. Mr. Demetry reviewed both the architectural drawings of the Ramp and of the proposed ramp ("Proposed Ramp") made by Plaintiff's expert witness, Ms. Marcia Esquenazi, an architect licensed in the State of New York. [Demetry's Dep., Exhibit 5, p. 44, L. 16 – 23]

85. The Proposed Ramp has handrails on the running slope, a curved handrail at the bottom, and two level and flat landings; its running slope is 1:12. [Demetry's Dep., Exhibit 5, p. 136, L. 7 – 10; p. 143, L. 6 – 19]

86. Mr. Demetry acknowledged that the Proposed Ramp is safer than the Ramp because it "has a landing that is flat and level." [Demetry's Dep., Exhibit 5, p. 143, L. 10 – 25; p. 144, L. 2 – 3]

87. Mr. Demetry acknowledged that the Proposed Ramp is safer than the Ramp because it "has a handrail."  [Demetry's Dep., Exhibit 5, p. 143, L. 2 – 22]

88. Mr. Demetry acknowledged that the Proposed Ramp is safer than the Ramp because it changes "the existing steepness of the slope, which is almost double what the ADA regulations state, to something that's closer to 1:12," the ramp slope ratio specified in the ADA Guidelines. [Demetry's Dep., Exhibit 5, p. 134, L. 2 – 12, 17 – 24; p. 133, L. 9 – 25]

89. Mr. Demetry testified that the Proposed Ramp is safer than the Ramp because it contains a curved handrail which "is a safety addition" for people with "a sight disability." [Demetry's Dep., Exhibit 5, p. 136, L. 7 – 23]

90. Mr. Demetry does not dispute that the cost of adding handrails to the Ramp will be $1,800, the same amount as estimated by Ms. Esquenazi. [Demetry's Dep., Exhibit 5, p. 114, L. 21 – 24]

91. Mr. Demetry does not dispute that the cost of making the Ramp's landing flat and level will be $2,000, the same amount as estimated by Ms. Esquenazi. [Demetry's Dep., Exhibit 5, p. 114, L. 21 – 24]

92. Mr. Demetry does not dispute that the cost of building and installing the Proposed Ramp will be $8,900, the same amount as estimated by Ms. Esquenazi. [Demetry's Dep., Exhibit 5, p. 114, L. 21 – 24]

93. Mr. Demetry agreed that "if $9,600 is spent to make the path of travel accessible, and that is less than 20 percent, that makes it 20 percent or less of the total cost that was spent on these [store] alterations." [Demetry's Dep., Exhibit 5, p. 224, L. 15 – 20]

94. Mr. Demetry testified that it was not his role as GBA's expert witness to "give a rundown of the process" of how the DOB and the DOT would approve the Proposed Ramp, stating as follows, "I'm not the applicant on this. I'm not going to give a rundown of the process how to get this approved. I'm not hired to file for it." [Demetry's Dep., Exhibit 5, p. 166, L. 20 – 25; p. 167, L. 2 – 16]

95. Mr. Demetry testified that, in his expert report, he omitted stating the information that there is a formal application process, which permits the DOB and DOT to grant a waiver, approval, and recommendation for construction of the Proposed Ramp. 2022 NYC Building Code § 1101.3.5 and § 1012.6; [Demetry's Dep., Exhibit 5, p. 166, L. 16 – 25; p. 167, L. 2 – 9; p. 170, L. 20 – 25; p. 171, L. 2 – 12; p. 175, L. 5 – 25; p. 176, L. 2 – 24]

96. Mr. Demetry testified that, in his expert report, he omitted stating that there are DOB code sections that specify application process to obtain approval for construction of the Proposed Ramp, including § 1101.3.5 regarding waivers for ramps and landings that encroach on

sidewalks and § 1012.6 concerning ramp landings. *See* 2022 NYC Department of Building

Code § 1101.3.5 and § 1012.6. [Demetry's Dep., Exhibit 5, p. 176, L. 2 – 24]

97. Mr. Demetry testified that in his expert report he did not include the information that there

exists an application process for a waiver of the DOB and the DOT rules and regulations

and that by such a waiver these city agencies may approve construction of the Proposed

Ramp, because he was "not listing a roadmap how to approve this proposed ramp. That's

not what I was discussing. What I was looking at for the ramp, it's not my application to

approve." [Demetry's Dep., Exhibit 5, p. 166, L. 16 – 25; p. 167, L. 2 – 9; p. 170, L. 20 –

25; p. 171, L. 2 – 12]

98. Mr. Demetry's expert report states that his firm "Sotir was further retained to *proactively*

*recommend proposals* for removing architectural barriers that allegedly exist at the

Premises, so as to satisfy applicable ADA regulations, and to determine the feasibility of

implementing such proposals. Sotir's findings are published in the instant report."

(emphasis added) [Sotir Report, Exhibit 6, p. 1, ¶ 3]

99. When asked to explain § 202.4 of the 2010 ADA Guidelines, regarding a path of travel that

is "readily accessible and usable by individuals with disabilities to the maximum extent

feasible," Mr. Demetry testified as follows: "to the maximum extent feasible, if it's – if it's

possible. The maximum – if there's a possibility of making this ADA accessible route, then

it has to be done" and "it's determined by the cost of the job compared to the value of the

construction of the building." [Demetry's Dep., Exhibit 5, p. 217, L. 22 – 25; p. 218, L. 2

– 12]

100.     Mr. Demetry testified that the Proposed Ramp is 44 inches wide and that it projects 44 inches from the building's property line on the sidewalks of 108th Street and on 48th Avenue. [Demetry's Dep., Exhibit 5, p. 72, L. 8 – 12]

101.     Mr. Demetry testified that he agreed that the 2022 NYC DOB Code § 3201.9 permits "any encroachments on public right of way that exceeds the limitation provided for in this Chapter shall require the approval of the DOT" and provides for an application and approval process for construction of the Proposed Ramp. 2022 NYC Department of Building Code § 3201.9. [Demetry's Dep., Exhibit 5, p. 174, L. 17 – 25; p. 175, L. 2 – 4;]

102.     Mr. Demetry testified that 2022 NYC DOB Code § 1101.3.5 allows construction of a ramp more than 44 inches from a building's property line. [Demetry's Dep., Exhibit 5, p. 74, L. 11 – 25; p. 75, L. 2 – 8]

103.     Mr. Demetry testified that the DOB and NYC Department of Transportation ("DOT") will recommend and approve construction of the Proposed Ramp if there is sufficient space for pedestrian traffic on the sidewalk. [Demetry's Dep., Exhibit 5, p. 71, L. 6 – 25; p. 72, L. 2]

104.      Mr. Demetry testified that he is aware that there exists the DOT Street Design Manual that states that clear width space for pedestrian traffic on a sidewalk should be eight feet wide or the width of half the distance from a building's property line to the curb, whichever is greater.  [Demetry's Dep., Exhibit 5, p. 70, L. 9 – 25; p. 162, L. 11 – 19; p. 182, L. 9 – 25; p. 183, L. 2 – 8]

105.     Mr. Demetry testified that for the DOB and DOT to make their determination to approve construction of the Proposed Ramp, it is important for the city agencies to have

measurements of distances from the property line to the curb on 108th Street and 48th Avenue. [Demetry's Dep., Exhibit 5, p. 75, L. 9 – 21]

106.     Mr. Demetry testified that neither during his inspection of the store, nor at any other time, did he measure the distances from the property line to the curb on 108th Street and 48th Avenue, and that he does not know what they are. [Demetry's Dep., Exhibit 5, p. 75, L. 22 – 25; p. 76, L. 2 – 9]

107.     Mr. Demetry testified that he accepts the measurements recorded by Plaintiff's expert Marcia Esquenazi, who measured the property line to the curb on 108th Street and determined it to be 18, with nine feet being one half of that distance. [Demetry's Dep., Exhibit 5, p. 180, L. 11 – 15]

108.      Mr. Demetry testified that he accepts as accurate the measurements recorded by Plaintiff's expert, Ms. Marcia Esquenazi, who measured the property line to the curb on 48th Avenue and determined the distance to be 15 feet, with 7.5 feet being one half. [Demetry's Dep., Exhibit 5, p. 180, L. 6 – 10]

109.     Mr. Demetry testified that he does not dispute the conclusion that if the landings of the Proposed Ramp have dimensions of 44 inches in width by 60 inches in length, or 60" x 60," then there would be clear width distance for pedestrian traffic on the sidewalk of 108th Street of at least 13 feet and that there would be a clear width distance for pedestrian traffic of at least ten feet on the sidewalk of 48th Avenue. [Demetry's Dep., Exhibit 5, p. 180, L. 18 – 25; p. 181, L. 2 – 25; p. 182, L. 2 – 8]

110.     Mr. Demetry testified that the DOB and DOT will approve construction of the Proposed Ramp if the ramp landings are changed to dimensions of 60" x 60"; He also testified that these city agencies will approve the ramp if they "make a determination" that

there exists sufficient space on the sidewalk for pedestrian traffic and that "they may be approved, but not as of right." [Demetry's Dep., Exhibit 5, p. 58, L. 21 – 25; p. 64, L. 2 – 25]

111.    Mr. Demetry testified that constructing the proposed ramp does not require the removal of a structural barrier. [Demetry's Dep., Exhibit 5, p. 234, L. 15 – 25; p. 235, L. 1 – 5]

112.    Mr. Demetry testified that he did not include in his report all the applicable 2002 NYC DOB Code rules and regulations that explain how an applicant can obtain approvals for construction of a proposed ramp from the DOT and the DOB. He also testified that he did not include in his report DOB § 1101.3.5, § 1012.6, and § 3201.9, because his goal was not to obtain an approval. He said "that wasn't what I'm trying to accomplish." [Demetry's Dep., Exhibit 5, p. 176, L. 2 – 25; p. 177, L. 2 – 25; p. 178, L. 2 – 9]

113.    Mr. Demetry testified that the DOB and DOT may approve construction of the Proposed Ramp with ramp landings of 44" x 60", if one will "go to court, get approval from a [federal] judge that you can do a 44" x 60" [inches of landing] and then come back to us [DOB] so we will give you variances from our own code" in order to build the Proposed Ramp, a safer ramp with a less steep slope. [Demetry's Dep., Exhibit 5, p. 150, L. 17 – 25; p. 151, L. 2 – 25; p. 152, L. 2 – 25; p. 153, L. 2 – 25]

114.    Mr. Demetry testified that if "a federal court [is] giving the okay to modify this dimension to 44 inches by 60" inches then the DOB may approve construction of the Proposed Ramp. [Demetry's Dep., Exhibit 5, p. 230, L. 9 – 25, p. 231, L. 2 – 25; p. 232, L. 2 – 7]

115.    Mr. Demetry testified that grant of approval for the Proposed Ramp's landing dimensions of 44" x 60" "is not a safety issue" and only involves an issue of "does a wheelchair user have sufficient legroom" and whether a 30" wheelchair can maneuver within a 44" landing.  [Demetry's Dep., Exhibit 5, p. 140, L. 3 – 25; p. 141, L. 2 – 4; p. 145, L. 9 – 14]

116.    Mr. Demetry testified that an average wheelchair with a width of thirty 30" "may maneuver within a 44" wide landing" and that it is not the same level of importance compared to a safety issue of having no handrails and a very steep slope that is "twice as steep" as recommended by the ADA Guidelines. [Demetry's Dep., Exhibit 5, p. 145, L. 3 – 19]

117.    Mr. Demetry testified that his primary objection with the Proposed Ramp is that it would not completely prevent and defeat future lawsuits against GBA if the landing is not 60" x 60". He said "so ten years from now, five years from now, someone else could come in and pick up those measurement [sic] and then sue the store again for having an – a less-than-compliant ADA-compliant ramp. Same case. We didn't accomplish anything." [Demetry's Dep., Exhibit 5, p. 142, L. 11 – 25]

118.    Mr. Demetry testified that odds would increase and "chances go up and improve" that the DOB would approve construction of the Proposed Ramp if the ramp landings are changed from 44" x 60" to 60" x 60". [Demetry's Dep., Exhibit 5, p. 150, L. 17 – 25; p. 151, L. 2 – 25; p. 152, L. 2 – 25; p. 153, L. 2 – 25 ]

119.    Mr. Demetry testified that "to maximum extent feasible" means strict 100% compliance with ADA Guidelines. There was the following exchange during the deposition: "So to make something readily accessible to the maximum extent feasible,

would you agree that means it doesn't have to be 100 percent compliance, but something a little less can still be to the maximum extent feasible? A. No." [Demetry's Dep., Exhibit 5, p. 242, L. 9 – 15]

120.    Mr. Demetry testified that he does not have sufficient expertise with providing a submission to the DOT on issues of "sidewalk traffic capacity." He said "I cannot answer definite answers on how to do a traffic analysis on sidewalks" for the DOT. [Demetry's Dep., Exhibit 5, p. 62, L. 2 – 25; p. 63, L. 2 – 8]

121.    When asked whether the DOB and the DOT would approve the Proposed Ramp, Mr. Demetry said that "I really don't know because we did not go this far with wrapping a ramp around any corner building," referring to his experience with his architectural firm Sotir Associates. [Demetry's Dep., Exhibit 5, p. 231, L. 17 – 25; p. 232, L. 2 – 25; p. 233, L. 2 – 16]

122.    Mr. Demetry testified that he does not have real world experience and neither does his firm Sotir & Associates "has real world experience of going through the process of trying to get a proposed ramp, a ramp that wraps around the corner, to be approved – or recommended by the Department of Transportation or approved by the New York City Department of Buildings." [Demetry's Dep., Exhibit 5, p. 236, L. 4 – 12]

123.    Mr. Demetry was unable to identify prior instances of his "real world" experience that serve as factual support for his prediction that DOB and DOT would not approve construction of the Proposed Ramp. [Demetry's Dep., Exhibit 5, p. 236, L. 4 – 25; p. 237, L. 2 – 25; p. 238, L. 2 - 25]

124.    Mr. Demetry testified that in the past he had experience with submitting applications for waivers to the DOT, which involved fences, not ramps. He stated that the

DOT approved his requests "4 out of 5 times," and possibly the fifth request was delayed and eventually approved. [Demetry's Dep., Exhibit 5, p. 239, L. 7 – 25]

125.      Mr. Demetry testified that he requested a variance from the DOB at least 20 times. He stated "I would say it's a 99-percent success" rate. [Demetry's Dep., Exhibit 5, p. 240, L. 8 – 25]

## DEPOSITION AND REPORT OF GIOVANNI GUTIERREZ, PRINCIPAL OF GIO WINE & SPIRITS CORP.

126.      Giovanni Gutierrez was the sole owner of Gio Wine & Spirits Corp. ("Gio") since 2007. [Deposition of Mr. Giovanni Gutierrez, sole owner of Gio ("Gutierrez's Dep.") Exhibit 7, p. 10, L. 3 – 9]

127.      Since 2007 Gio operated a liquor store, located at 48-01 108th Street, Corona NY. [Gutierrez's Dep., Exhibit 7, p. 10, L. 15 – 17]

128.      Since 2007 Gio leased the store from Cesar Carbajal, an individual who at the time owned the building located at 48-01 108th Street, Corona NY. Exhibit 8, Leases from Cesar Carbajal to Gio Wine & Spirits Corp. dated June 1, 2007, and July 1, 2017.

129.      Since 2007, when Gio first leased the store, there was the same ramp as now, located in front of the store; it leads to the store's entrance door. [Gutierrez's Dep., Exhibit 7, p. 16, L. 6 – 11]

130.      Prior to 2007, there was a different liquor store operating at the present location, 48-01 108th Street, Corona, NY, named Cesar's Liquors. It was owned by Cesar Carbajal, the building's owner. Prior to Cesar's Liquors, there was a laundromat operating at the same location. [Gutierrez's Dep., Exhibit 7, p. 11, L. 2 – 25; p. 12, L. 2 – 8]

131.     The basement walls of Gio Liquors consist of concrete pillars and concrete walls. [Gutierrez's Dep., Exhibit 7, p. 19, L. 1 – 10; p. 20, L. 3 – 16]

132.     Gio does not keep records of its sales of liquor. [Gutierrez's Dep., Exhibit 7, p. 28, L. 15 – 23; p. 29, L. 7 – 10]

133.     Giovanni Gutierrez testified that his accountant has records of Gio's sales. Mr. Giovanni Gutierrez also testified that he only knows the accountant's first name, Javier. He testified that he does not know his last name and address. [Gutierrez's Dep., Exhibit 7, p. 39, L. 2 – 25; p. 40, L. 1 – 6]

134.     Giovanni Gutierrez testified that it is not his responsibility to investigate the Ramp. [Gutierrez's Dep., Exhibit 7, p. 55, L. 7 – 23]

135.     In May 2021 there was no buzzer available on the exterior of the store Gio Liquors, which would enable someone outside of it to ring it and request attention of a clerk inside the store. [Gutierrez's Dep., Exhibit 7, p. 55, L. 15 – 20]


Dated: January 26, 2024

*Michael Grinblat*

Michael Grinblat, Esq. (4159752)

Attorney for Plaintiff
Law Offices of Michael Grinblat
10 East 39th Street, 12th Floor
New York, NY 10016
Tel: (347) 796-0712
Email: michael.grinblatesq@gmail.com
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 26, 2024, I filed the foregoing Plaintiff's Statement of Material Facts with the Court via CM/ECF, which caused notice to be served upon all e-filing attorneys of record.

January 26, 2024

Respectfully submitted,

*Michael Grinblat*

Michael Grinblat, Esq. (4159752)

Attorney for Plaintiff
Law Offices of Michael Grinblat
10 East 39th Street, 12th Floor
New York, NY 10016
Tel:  (347) 796-0712
Email: michael.grinblatesq@gmail.com