# **EXHIBIT 5**

1

2      UNITED STATES DISTRICT COURT
       IN AND FOR THE EASTERN DISTRICT OF NEW YORK
3      -----------------------------------------X
       LEONID TREYGER,
4
                                   PLAINTIFF,
5
                     -against-        Case No.:
6                                     23-cv-2099-HG

7      GIO WINE & SPIRITS CORP, GBA 526 LLC,

8                                   DEFENDANTS.
       -----------------------------------------X
9

10                           DATE: December 29, 2023

11                           TIME: 10:18 a.m.

12

13          VIRTUAL DEPOSITION of the Defendant,

14     Given by a Witness, HANY DEMETRY, taken by

15     the Plaintiff, pursuant to a Court Order,

16     and to the Federal Rules of Civil Procedure,

17     before Madeline Tavani, a Stenographic

18     Reporter and Notary Public of the State of

19     New York.

20

21

22

23

24

25

```
 1

 2      A P P E A R A N C E S:

 3

        LAW OFFICES OF MICHAEL GRINBLAT
 4           Attorneys for the Plaintiffs
             LEONID TREYGER
 5           10 East 39th Street, 12th Floor
             New York, New York 10016
 6           BY: DANIEL BERKE, ESQ. Of-Counsel
             Danberke100@gmail.com
 7

 8      LEVIN-EPSTEIN & ASSOCIATES, P.C.
             Attorneys for the Defendants
 9           GIO WINE & SPIRITS CORP, GBA 526 LLC
             60 East 42nd Street, Suite #4700
10           New York, New York 10165
             BY: JASON MIZRAHI, ESQ.
11

12           *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          City Department of Transportation rule that

3          applies to this situation that was not

4          considered in making your conclusion, that

5          would affect the validity of your

6          conclusion, correct?

7              A.   Correct.

8              Q.   Okay.  Now you mentioned that you

9          went to the site, yes?

10             A.   Correct, yes.

11             Q.   You did a site survey, correct?

12             A.   Yes.

13             Q.   You did it on November 7th, 2023?

14             A.   Yes.  Yes, correct.

15             Q.   You did it at the location of

16         48-101 108th Street, Corona, New York,

17         correct?

18             A.   Corona, correct.

19             Q.   That's the site of Gio Wine &

20         Spirits Corp, correct?

21             A.   Correct, yes.

22             Q.   A liquor store?

23             A.   It is a liquor store, yes.

24             Q.   Okay.  You're on-site survey

25         confirmed it's a liquor store, correct?

1

2      until 2015.  So that's, like, 13-plus or 14

3      years.

4              Q.   Okay.  And what about as a

5      registered architect, measuring to see if

6      sites were ADA complaint, how many years?

7              A.   Eight and a half years.

8              Q.   Eight and a half.  Okay.

9                   When you went out to the site, did

10     you make yourself a checklist of what you

11     wanted to measure?

12             A.   I didn't create a checklist.  I

13     then went over it.  I measured like any

14     other site that we measure.  Just go in and

15     see what's happening and what do we need

16     from the site.  And I do the determination

17     and measure whatever I need from the site.

18             Q.   You said you did or did not create

19     a checklist?  I didn't hear.

20             A.   I did not write a checklist, but I

21     would have a checklist of things that I

22     would need if I'm drafting this back in the

23     office.  So I did not write down a

24     checklist.

25             Q.   I'm asking, when you're on-site,

1

2          A.    Yes.

3          Q.    For those seven days before coming

4     here, did you think that you would be asked

5     about those measurements?

6          A.    No.  Because whatever is noted on

7     the report is what was measured.

8          Q.    Okay.  So you're saying your

9     measurements are in the report.  Is that

10    what you're saying?

11         A.    There are measurements in the

12    report, and there are measurements of the --

13    the report that was presented from the

14    other -- from the people who was raising the

15    complaint.

16         Q.    Did you rely upon the measurements

17    of Marcia Eskenazi, architect who was hired

18    by the plaintiff, Leon Treyger, in this

19    action?

20         A.    No.  Except for the proposed ramp

21    that they had presented on their report,

22    that's --

23         Q.    Okay.

24         A.    -- being considered as --

25         Q.    So you took down 20 to 30

1

2          Q.    Okay.  And it had no relevance?

3          A.    Yes, it had no relevance.

4          Q.    Okay.  Now, would you agree with

5     me that -- let me -- I'm sorry.  Let me

6     withdraw that.

7                In your experience, have you ever

8     designed ramps for store entrances in New

9     York City?

10         A.    Yes.

11         Q.    Have you ever designed them for

12    the purposes of being ADA-complaint?

13         A.    Yes.

14         Q.    Have you ever designed them for

15    corner stores?

16         A.    Yes.

17         Q.    Have you ever designed a corner

18    store where the ramp would go to a corner

19    and then wrap around that corner?

20         A.    No.

21         Q.    Are you aware that some ramps may

22    be approved by New York City Buildings

23    Department to wrap around a corner?

24         A.    They may be approved, but not as a

25    right.

1

2      a ramp that wraps around the corner of an

3      existing store, correct?

4          A.    Yeah, yeah.  If they have to do it

5      for the ramp to wrap around a building, yes.

6          Q.    So when you say "sidewalk traffic

7      capacity," what does that mean?

8          A.    How many pedestrians are using the

9      corner; how many pedestrians are waiting for

10     a bus; how many pedestrians cross in each

11     direction; how many pedestrians come in a

12     certain direction heading to a train

13     station; how many of them are coming back

14     from work; traffic lights.

15             Because this -- we're killing a

16     good chunk of the corner of the intersection

17     by creating a turnaround landing, change of

18     direction.  And that's where it doesn't get

19     approved, it doesn't get anywhere.  It's

20     not -- it doesn't work.  Nobody does it, it

21     don't work.

22         Q.    When you say "sidewalk traffic

23     capacity," you said the number of people

24     walking on the sidewalk, correct?

25         A.    Yes.

1

2          Q.   Does that -- does that also
3     include an analysis of how many people can
4     fit on the sidewalk or walk on the sidewalk?
5          A.   Most likely, yes.  I'm not an
6     expert on this analysis, so I cannot answer
7     definite answers on how to do traffic
8     analysis on sidewalks.
9          Q.   Well --
10         A.   It's not a standard approval.
11    It's not a -- it's not an as-of-right
12    approval.  This is a very special case,
13    and --
14         Q.   Okay.
15         A.   -- it needs special approval.
16         Q.   So.  Okay.  So, you're aware that
17    the Department of Transportation gets
18    involved of evaluating the sidewalk traffic
19    capacity, and they want to evaluate:  Is
20    there enough room on the sidewalk to
21    accommodate a ramp?  Is that what they want
22    to do?
23         A.   I guess so, yes.  That's what they
24    analyze it for.  Can you fit a ramp and its
25    landings on this sidewalk?

1

2          Q.    Okay.  And to determine -- for the

3    Department of Transportation to determine if

4    it could fit a ramp and its landing on a

5    sidewalk, does that require measuring the

6    length and width of the sidewalk?

7          A.    Yes, of course.

8          Q.    Okay.

9          A.    It does.

10         Q.    The width of the sidewalk is

11   relevant to determining how many people can

12   fit on the sidewalk if there's a ramp,

13   correct?

14         A.    Correct.

15         Q.    So -- so measuring -- I'm sorry.

16              To create a ramp that wraps around

17   a corner of a building, would you agree with

18   me that it's important to know how many

19   people can fit on that sidewalk where you're

20   wrapping around the ramp?

21         A.    Yes.  It will be important to know

22   how many pedestrians are on the sidewalk.

23         Q.    Right.  And also, how much room

24   there is on the sidewalk for those

25   pedestrians to fit, correct?

1

2      ramp, correct?

3              A.   Correct.

4              Q.   And they evaluate what is the

5      remaining space on the sidewalk for

6      pedestrians, right?  From the ramp to the

7      curb, correct?

8              A.   Correct.

9              Q.   And if the Department of

10     Transportation determines there's sufficient

11     space on the sidewalk for both the ramp and

12     pedestrians, the Department of

13     Transportation can provide approval for

14     building this ramp, correct?

15             A.   They provide recommendation.

16             Q.   Okay.  And they may provide a

17     recommendation, correct?

18             A.   Correct.

19             Q.   And when you say "a

20     recommendation," meaning it's okay with the

21     Department of Transportation if they find

22     there's enough space on the sidewalk,

23     correct?

24             A.   Yes, correct.

25             Q.   And the Department of

1

2      Transportation issues a written

3      recommendation?

4           A.   In this case, yes.  They do issue

5      a written recommendation.

6           Q.   So if there's a proposed plan to

7      build a ramp, a wraparound corner ramp, the

8      Department of Transportation, after

9      reviewing the plans, may provide a

10     recommendation that it's okay with the

11     Department of Transportation to move forward

12     with building such ramp, correct?

13          A.   Yes, correct.

14          Q.   Provided there's a measurement

15     that there's sufficient space on the

16     sidewalk, correct?

17          A.   Yes, correct.

18          Q.   And that measurement is from the

19     ramp to the curb to see if there's

20     sufficient space, correct?

21          A.   Yes, correct.

22          Q.   And that measurement the

23     Department of Transportation wants to

24     investigate is also how much space is there

25     from the building line to the curb, correct?

1

2          A.   Yes, correct.

3          Q.   When you first received Marcia

4     Eskenazi's proposed ramp drawing for this

5     matter, did you look and see how wide her

6     ramp was proposed to be on 48th Avenue?

7          A.   Yes, I did.

8          Q.   And when you first saw her drawing

9     7 to 10 days before writing your report, did

10    you recognize that she had proposed a

11    44-inch-wide ramp?

12         A.   Yes.

13         Q.   And did you recognize that, at the

14    time, that to go forward with building this

15    ramp, a recommendation from the Department

16    of Transportation may be required?

17         A.   Yes.  I know that if we are

18    looking to go this variance approval, then a

19    recommendation from the Department of

20    Transportation will be required, yes.

21         Q.   So it's a particular name of a

22    recommendation that you ask for?  It's

23    called "variance," is that what you're

24    saying?

25         A.   Yes.  Anything that is not

1

2      this option.  Your words, correct?

3           A.    Someone -- can you say that again?

4           Q.    When you saw -- when you saw

5      Marcia Eskenazi's proposed ramp, that --

6           A.    Yes.

7           Q.    -- would go along the side of 48th

8      Avenue of the store Gio liquors or in the

9      building 4801 108th Street --

10          A.    Yes.

11          Q.    -- at that time, when you saw her

12     proposal seven to ten days before writing

13     your report, you recognized:  One, that it

14     would require a variance from the Department

15     of Transportation, correct?

16          A.    Correct.

17          Q.    Two, that her ramp was 44 inches

18     wide on the 48th Avenue side, correct?

19          A.    Correct.

20          Q.    Okay.  Three, to get a

21     recommendation from the Department of

22     Transportation for this proposed ramp, a

23     measurement would need to be taken of how

24     much space would be remaining on the

25     sidewalk of 48th Avenue from the ramp to the

1

2      curb, correct?

3           A.   Correct.

4           Q.   And the Department of

5      Transportation would be interested in such

6      measurement in order to approve a variance

7      for purposes of the ramp?

8           A.   Correct.

9           Q.   So that measurement of the

10     building line to the curb is important to

11     the Department of Transportation in whether

12     to issue a variance, correct?

13          A.   Correct.

14          Q.   And that meant from the wraparound

15     ramp -- and we're talking about the ramp

16     portion on 48th Avenue -- the measurement of

17     44 inches is important to the Department of

18     Transportation to determine if it can

19     approve a variance for that ramp, correct?

20          A.   Yes, correct.  The 44 inches is

21     important.

22          Q.   And the additional measurement

23     of -- after you go 44 inches from the

24     building line, the Department of

25     Transportation would also be interested in

1

2          the measurement from the proposed ramp on

3          48th Avenue, how much distance is there from

4          the proposed ramp to the curb line, correct?

5          The Department of Transportation is also

6          interested in that measurement?

7                A.   Correct.  But they don't take it

8          from me.  They don't need me to measure.

9          They're not going to accept it if I measure.

10               Q.   I'm just saying --

11               A.   -- assumption that we're going to

12         the Department of Transportation.  They

13         wouldn't take my measurement of the

14         sidewalk.

15               Q.   Well, Mr. Demetry, I'm asking you,

16         you agree with me that the Department of

17         Transportation --

18               A.   Well, they --

19               Q.   -- is interested -- is interested

20         in those measurements?

21               A.   Yes, yes.

22               Q.   And it's relevant to the

23         Department of Transportation if they're

24         going to approve a variance for building a

25         ramp on 48th, Avenue, correct?

1

2          (Whereupon, a short break was taken.)

3     BY MR. BERKE:

4          Q.   In your report, Plaintiff's 1, you

5     wrote that you -- I'm sorry.  You wrote that

6     you have to make a determination whether or

7     not the ramp leading to the entrance for the

8     store Gio liquors is accessible for disabled

9     people?

10         A.   No.  Say that again.  We need to

11    determine if it's -- if this ramp is

12    accessible?

13         Q.   Well, let me rephrase it.

14              Did you determine -- did you make

15    a determination based on your measurements

16    that the -- whether or not the ramp in front

17    of the store, Gio liquors, is accessible for

18    disabled people?

19         A.   Yes.  We made a determination that

20    it's not accessible to people with

21    wheelchairs.

22         Q.   Okay.  And aside from people with

23    wheelchairs, how about people with walkers?

24    Is it also not accessible for people with

25    that type of disability?

1

2          states, correct?

3                A.   Yes.

4                Q.   And so the ADA states that a slope

5          ramp should be 1:12, in that ratio.

6          Correct?

7                A.   Correct.

8                Q.   And the ratio of this ramp is 2

9          to -- is what?  1:24?

10               A.   It has different slopes, but the

11         steepest has like 2 1/4 inch to a foot, to

12         12 inch.

13               Q.   So it's almost 1:6, correct?

14               A.   Yeah, yeah.

15               Q.   It's almost double.  So if you

16         double it, you have got to halve the ratio?

17               A.   Yes, yes.

18               Q.   And that's a steep slope; too

19         steep for the ADA's -- too steep to comply

20         with the ADA regulations, correct?

21               A.   Yes.

22               Q.   And a slope that is twice the

23         ADA -- twice the steepness of what the ADA

24         recommends can present a problem for safety.

25         Would you agree about that?

1

2          the 12-foot distance up the ramp, correct?

3               A.   Yes, correct.

4               Q.   And there's a risk that they may

5          go backwards, correct?  If they don't have

6          the power of --

7               A.   Yes.

8               Q.   -- a manual wheelchair to wheel

9          themselves up the 12 feet of this steepness.

10         There's a safety risk that they may go

11         backwards and hurt themselves, correct?

12              A.   Yes, correct.

13              Q.   They may fall?

14              A.   Correct.  Yeah, they may fall.

15              Q.   They may hit their head, correct?

16              A.   A lot of things can happen if they

17         fall, yes.

18              Q.   Okay.  So that's one of them.  You

19         agree that's one of the risks?

20              A.   Yes.  It's a possibility.

21              Q.   Okay.  Now, pursuant with a

22         walker, let's say going down the ramp, it

23         can be just as dangerous, correct?  Because

24         they're working -- they're going -- if it's

25         too steep going down the ramp, they're

1

2          working against gravity.  Correct?

3               A.   Yes, they're working against

4          gravity.

5               Q.   And they're being pulled down by

6          gravity, right?  Down the ramp?

7               A.   Yes.  I don't think the ADA -- I

8          don't know the ADA calls for ramps for

9          people with walkers, but if we're going

10         ahead with applying the same rules on people

11         with walkers and wheelchairs, then, yes,

12         yes.

13              Q.   This existing ramp in front of the

14         store, Gio liquors, is not safe, agreed?

15              A.   No.  It's not ADA accessible or

16         meant to be.

17              Q.   Okay.  And now, when you say it's

18         not meant to be, how do you know what this

19         ramp is meant for?

20              A.   Because there was no requirement

21         for them to provide an ADA-accessible route

22         to this entrance of the store.  This store

23         has been in existence since the '20s, and

24         that's the way it's been.  Nobody raised the

25         elevation, nobody lowered the elevation and

1

2          then raised it again, so they lost a

3          grandfathered condition --

4               Q.   How do you know --

5               A.   -- with the Department of

6          Buildings, and they did require them to put

7          in a ramp.  That's a --

8               Q.   Do you know for certain the date

9          this ramp was installed or constructed?

10              A.   The date?  No.

11              Q.   You were assuming that this ramp

12         was constructed back in 1920, correct?

13              A.   No, no, no.  I didn't say the ramp

14         was constructed in 1920.  I said the store

15         was in existence since 1920s.

16              Q.   When was the ramp constructed?

17              A.   I don't know.  I don't have a

18         record.

19              Q.   So if the ramp was constructed

20         after 1991, it has to comply with the 1991

21         ADA rules and regulations, correct?

22              A.   After 1991, yes.

23              Q.   Okay.  Now --

24              A.   Hold on a minute.  If it -- if

25         it's a grandfathered condition and we're not

1

2          just the ramp.

3                  The issue is not just the ramp.

4          The ramp and the entrances and the

5          clearances, the clearances inside the store,

6          pull side from the door, push side from the

7          door and so on and so forth.

8          Q.   Okay.  So let me see if I

9          understand.  You do agree that the ramp is

10         not in compliance, correct?

11         A.   Yes.  The ramp is not in

12         compliance with ADA regulations.

13         Q.   Okay.  And it's not safe for

14         people with disabilities, correct?

15         A.   No.  It should not be used by

16         someone with a wheelchair.

17         Q.   It's missing a handrail, and it

18         requires a handrail, correct?

19         A.   According to ADA regulations, it's

20         missing a handrail.

21         Q.   Okay.  And the slope is too steep,

22         right?  The slope is almost double what the

23         ADA recommends, correct?

24         A.   Yes.

25         Q.   And the landing is not level

1

2       because we've seen photographs of

3       measurements of the landing, and the landing

4       ranges from 15 -- between 15 and 16 inches

5       and up to 18 inches?

6            A.   Yes.

7            Q.   So you agree it's not level,

8       correct?

9            A.   Correct.

10           Q.   And so there's not a level resting

11      spot if someone is in a wheelchair; they

12      can't be --

13           A.   Correct.

14           Q.   They can't be certain if they stop

15      their wheelchair on the landing that their

16      wheelchair is going to stay put if the

17      landing is not level, agreed?

18           A.   Agreed, yes.

19           Q.   Okay.  And then there's another

20      difference.  There's a difference between

21      where the landing and 18 inches is, that

22      height from the sidewalk and the front door

23      entrance.

24               It's either a 2- to 4-inch

25      difference depending on where you're

1

2          standing on the landing, correct?

3                A.   Correct.

4                Q.   And we've seen that by the photos

5          of the two rulers.  The T-square made by the

6          ruler.  Agreed?

7                A.   Agreed.

8                Q.   Okay.  Now, you testified that the

9          ADA is not just remedying defects in the

10         ramp that's in front of the store, correct?

11               A.   Correct.

12               Q.   You mentioned there are other

13         considerations, correct?

14               A.   Correct.

15               Q.   You mentioned the front entrance

16         door has some problems that need to be

17         fixed; is that correct?

18               A.   Yes, correct.

19               Q.   You're saying it has problems with

20         clearance, that there's not enough entrance

21         on the left or the right?

22               A.   Correct.

23               Q.   Okay.  And you're saying, if you

24         fix the ramp without fixing the door, then

25         it's not compliant with the ADA.  Is that

1

2      what you're saying?

3           A.   Correct.

4           Q.   Now, to fix the door, if there's

5      an electronic push button and the door

6      opens, like a door assist, does that solve

7      the problem of not having clearance by the

8      door?

9           A.   The push button could.  But it has

10     to be -- you don't have enough clearance on

11     the landing itself to clear the door while

12     it's opening even electronically.

13          Q.   Well, this door pushes in.  So is

14     it possible to clear a -- create a push

15     button where the door opens into the store?

16          A.   As a commercial space, the door

17     should push out.  It should not push in in

18     commercial store.

19          Q.   Okay.  This door pushes in,

20     correct?

21          A.   This door pushes in, correct.

22          Q.   The existing door -- the existing

23     door pushes in?

24          A.   Yes, yes.

25          Q.   So you're saying that's a

1

2      violation?

3           A.    This is not at issue right here.

4           Q.    I'm asking, is that compliant with

5      the code.  Yes or no?

6           A.    The New York City code?  No.

7           Q.    So now we're talking about

8      entrance for a wheelchair.  If you have a

9      push button that automatically assists in

10     opening the door, that will help a disabled

11     person in the wheelchair enter the store,

12     correct?

13          A.    Opening in?  Yes.  It will work.

14          Q.    Okay.  And it will make it easier

15     for a disabled person to go in and out of

16     the store, correct?

17          A.    Yes.

18          Q.    Okay.  And that would be a

19     benefit, correct?

20          A.    That will be a benefit --

21          Q.    For disabled people, if they can

22     enter the store through a readily accessible

23     manner, right?

24          A.    Yes, even if you're pushing a

25     button and you have the door, still this

1

2      landing is not going to work.

3           Q.   Okay.

4           A.   -- which direction.  And on a

5      ADA-compliant ramp, you need 5 feet by 5

6      feet, you need it turn around.  And the

7      clearance is 5 feet by 5 feet.  This 5 feet

8      by 5 feet radically affects the direction of

9      the door, which we said, okay, you can leave

10     it alone.  But you still have to the change

11     the storefront.

12          Q.   So let me ask you this:  The

13     existing ramp, you've agreed we've

14     identified there's some unsafe features

15     about it, correct?

16          A.   For people with wheelchairs, yes.

17          Q.   People with wheelchairs, people

18     with walkers and people with crutches,

19     agreed?  It's unsafe for those groups of

20     people, correct?

21          A.   Anyone that would fall under the

22     ADA category, then, yes.  It's not safe.

23          Q.   Okay.  Which, when we say "it's

24     not safe," let's focus right now on the

25     slope.  And the slope is of a certain

```
 1
 2        steepness that we mentioned presents a risk
 3        of physical injury to individuals, to
 4        disabled individuals, correct?
 5             A.   Correct.
 6             Q.   We mentioned they can fall
 7        backwards; they can fall forward.  Correct?
 8             A.   Yes.
 9             Q.   And that can cause physical bodily
10        harm, correct?
11             A.   Yes.
12             Q.   Okay.  And you would agree with me
13        that it would be an important goal to make
14        this ramp more safe.  Would you agree with
15        that?
16             A.   Making things better is a better
17        goal for everyone, but that doesn't make it
18        achievable.
19             Q.   Okay.  So you agree with me it
20        would be an important goal to make this
21        landing closer to level and more safe, yes?
22             A.   Yes, yeah.
23             Q.   You would agree with me it would
24        be an important goal to make this slope less
25        steep, and that way it would be more safe,
```

1

2          agreed?

3               A.   Yes.

4               Q.   And you agree with me that it

5          would be an important goal to add a handrail

6          to make it more safe, this ramp, agreed?

7               A.   Agreed.

8                    MR. BERKE:  Okay.  Now let's go to

9                    an exhibit.  It's going to be 17, the

10                   proposed ramp.

11         (Whereupon, the aforementioned exhibit was

12         deemed marked as Plaintiff's 17 Exhibit for

13         identification as of this date.)

14                   MR. BERKE:  If you can scroll down

15                   a little.  Okay.  And if you can zoom

16                   in to that picture number 2 on the

17                   left.  So if we can make that so you

18                   can see that mostly.

19         BY MR. BERKE:

20              Q.   All right.  Mr. Demetry, you

21         received this proposed architectural plan of

22         Marcia Eskenazi prior to writing your

23         report?

24              A.   Yes, I did receive.

25              Q.   And this is Plaintiff's 17.

1

2          intermediate landing at the corner that's

3          13 inches -- correct? -- in height?

4                A.    Correct, yes.

5                Q.    Okay.  And that slope is

6          consistent with the ADA regulations,

7          correct?

8                A.    No, it's not correct.

9                Q.    And what is incorrect about this?

10               A.    You're sloping down 7-inches and

11         you have a length of 6 feet, 10 inches and a

12         half.  You're missing an inch and a half.

13                     1:12, 1 down 12.

14               Q.    Okay.  So you're saying that inch,

15         it doesn't -- it comes close, but it's an

16         inch off?

17               A.    Yeah.  We made things better but

18         not correct.

19               Q.    The ratio for the slope is close

20         to 1:12.  It's just an inch off from 1:12?

21               A.    Yeah.  But on ADA, we don't round

22         them.

23               Q.    Before -- before, you would agree

24         the existing ramp is double the steepness of

25         what the ADA recommends?

```
 1
 2          A.   Yeah, yes.
 3          Q.   Okay.  So here you're making a
 4     point that shows that this is an inch off?
 5          A.   We made it much better.
 6          Q.   I'm saying -- just saying what
 7     you're saying.
 8               You're agreeing that you are
 9     pointing out that this is an inch off from
10     what the ADA recommends of a slope of 1:12,
11     correct?
12          A.   Correct.
13               MR. BERKE:  Okay.  Now, let's go
14          to picture one up top. Let's slide over
15          to the corner.
16     BY MR. BERKE:
17          Q.   Mr. Demetry, you would agree that
18     making a change to the existing ramp to go
19     from the existing steepness of the slope,
20     which is almost double what the ADA
21     regulations state, to something that's
22     closer to 1:12 is an important step towards
23     safety.  Would you agree with that?
24          A.   Yes.
25          Q.   Okay.  And that -- and changing
```

```
1
2          Q.   And it's a safer slope, correct?
3          A.   Yes, correct.
4          Q.   And it's safer than what's
5    existing, correct?
6          A.   Yes.
7          Q.   Okay.  Now, at the end of this
8    ramp there is a handrail that curves.  Do
9    you see that?
10         A.   Yes.
11         Q.   And that is not existing -- on the
12   current ramp as is exists, we don't have
13   that type of handrail, correct?
14         A.   No, we don't.
15         Q.   And is that handrail recommended
16   by the ADA?
17         A.   Yes.
18         Q.   And that's for safety, correct?
19         A.   That's for people with a sight
20   disability, yes.
21         Q.   Okay.  And it's a safety addition,
22   correct?
23         A.   Yes, yeah, yeah, yeah.
24         Q.   So by adding this type of
25   handrail, it also makes the access route to
```

1

2          A.   Correct.

3          Q.   And a wheelchair, your average

4     wheelchair.  Do you know what the width of

5     it is?

6          A.   An average wheelchair?

7          Q.   Yeah.

8          A.   29 inches.  28 inches, 30 inches.

9          Q.   So if you have a landing that's 5

10    feet by 5 feet, right?  60 inches by

11    60 inches?

12              If you have a wheelchair, if a

13    wheelchair is 30-inches, it can fit in

14    easily and turn, correct?

15         A.   Yes.

16         Q.   Okay.  And if you have a landing

17    that is less than 60 inches by 60 inches,

18    you'll have a little less space for a

19    wheelchair to turn, correct?

20         A.   Correct.

21         Q.   So if you have a landing that's

22    44 inches by 60 inches, you have a

23    wheelchair -- right? -- well, let's --

24    you'll have a wheelchair that will have to

25    maneuver within a width, the smallest width

1

2       of 44 inches, correct?

3          A.   Yeah.  But that doesn't make it

4       linear.

5          Q.   I understand.  But we're talking

6       now about space.  A wheelchair can fit --

7          A.   We can't apply -- we can't apply

8       common sense to these dimensions.

9                Like, my -- okay.  If we're

10      applying ADA -- if we're applying ADA; but

11      if we're not applying ADA, then we can argue

12      common sense.  What makes sense and what

13      doesn't.

14         Q.   Okay.  So when you -- you

15      mentioned the word "illegal" a few times,

16      correct?

17         A.   Yes.

18         Q.   And you mentioned in your report

19      that the proposed -- the proposed ramp by

20      Marcia Eskenazi is illegal?

21         A.   Correct.

22         Q.   Okay.  So your wording of

23      "illegal" -- right? -- illegal verses legal

24      is what you mean to say is, does it strictly

25      comply with the ADA?  Is that what you're

1

2      saying?

3           A.   Yes.

4           Q.   And so if the proposed ramp has a

5      landing of 44 by 60 inches, you are

6      testifying that it's illegal because it is

7      not strictly complying with the ADA

8      requirement of a 60-inch-by-60-inch ramp; is

9      that correct?

10          A.   Correct.

11          Q.   Okay.  And you are making clear

12     that this proposed ramp is illegal because

13     it doesn't have, what you consider to be, a

14     wide enough passing space for wheelchairs,

15     correct?

16          A.   No, not because it doesn't have

17     wide enough; it's because it doesn't comply.

18     Then I -- I dismiss something that's really

19     bad to make it better but not fully correct.

20               So ten years from now, five years

21     from now, someone else could come in and

22     pick up those measurement and then sue the

23     store again for having an -- a

24     less-than-compliant ADA-compliant ramp.

25     Same case.  We didn't accomplish anything.

1

2          Q.   Okay.  And so the proposed ramp

3     has a handrail, right?  That makes the ramp

4     safer than the existing ramp, correct?

5          A.   Yes.  Correct.

6          Q.   And the proposed ramp has a

7     landing that is flat and level as compared

8     to the existing ramp, correct?

9          A.   Correct.

10          Q.   So we accomplished two things --

11     right?  If the proposed ramp adds a

12     handrail, it makes it safer.  If it has a

13     flat landing, it makes it safer.  Correct?

14          A.   Correct.

15          Q.   And the proposed ramp doesn't have

16     such a steep slope as twice as steep as what

17     the ADA recommends.  Can you agree that's an

18     improvement, correct?

19          A.   Correct.

20          Q.   That makes the ramp safer than the

21     proposed ramp, correct?

22          A.   Correct.

23          Q.   But you draw the line and you say

24     if it doesn't have strictly 5-foot-by-5-foot

25     landing, you're saying the proposed ramp

1

2      doesn't work.  Is that your testimony?

3            A.   Yes.  It doesn't solve the issue.

4            Q.   Okay.  And now --

5            A.   It works.  But it doesn't solve

6      the issue.

7            Q.   Okay.  The issue is, number one,

8      will it be approved by regulatory agencies,

9      correct?

10            A.   No.  It would not be approved.  No

11      way.

12            Q.   So you're saying --

13            A.   -- how it works --

14            Q.   Hear me out.  You're testifying

15      that there's no possible way that this

16      proposed ramp can be approved by a city

17      agency, the New York City Department of

18      Buildings or the New York City Department of

19      Transportation.  Is that your statement?

20            A.   Yes.  They will not approve this.

21            Q.   Okay.  And you are reaching a

22      conclusion that they will not approve it,

23      and that is your opinion, correct?

24            A.   That is my opinion and experience,

25      and I am sure of it.  Why?  Because for the

1

2      dimensions.

3          Q.   You're sure of it.  Okay.

4              So the issue that you take -- you

5      take issue with is that the landing, you

6      want to make sure, is big enough so that the

7      wheelchair has a turning radius, correct?

8          A.   Correct.

9          Q.   And a turning radius on a level

10     landing is not a safety issue, would you

11     agree?  No one is going to fall -- no one is

12     going to fall --

13         A.   No one is going to roll off it,

14     yes.  That's correct.

15         Q.   Okay.  It's not the same issue,

16     safety issue, as a steep ramp that is twice

17     as steep as what the ADA recommends.  Would

18     you agree with that statement?

19         A.   Yeah.  It's level.  It's safer.

20         Q.   Okay.

21         A.   Someone decided with the Court in

22     2010 to pass this law.  It's a federal law

23     that consider -- that's considered to be

24     safe.  So I can't decide what's safe or not,

25     so I have to go by the numbers.

1

2       That's -- the code determination with the

3       Department of Buildings.  Yes.

4              Q.   Okay.  So, after -- okay.  So

5       someone submits -- I'm sorry.

6                   For this proposed ramp to be

7       built, the Department of Transportation has

8       to give a recommendation, correct?

9              A.   Mm-hmm.

10             Q.   And then, also, the New York City

11      Department of Buildings has to approve it,

12      correct?

13             A.   Correct.

14             Q.   And that's the CCD1 form that you

15      mentioned, correct?

16             A.   Correct.

17             Q.   Where if you submit -- where if

18      someone submits their proposed plans and

19      they explain the goals of the plans, there's

20      a possibility that the New York City

21      Buildings Department will approve the

22      proposed plans, correct?

23             A.   Yes.  But we are asking for a

24      waiver to waive another section of the code.

25      Now we are -- first of all, the Department

1

2          of Buildings does not have authority to

3          alter or give any variances to the

4          dimensions on a ADA clearance.  Why?

5          Because this is not a code issue; this is

6          law.  This is a federal law.  It's not under

7          their jurisdiction.  What they can give you

8          permission for or a variance for is to go

9          beyond the 44 inches that's permanent

10         as-of-right for ADA purposes.

11               So you're going and asking them,

12         instead of 44, I need 50 inches.  Why?

13         Because one, two, three, four.  So they

14         accept that part.  But if you go in and tell

15         them, okay, you know what, I'm going over 44

16         inches and I'm going on two streets because

17         that's a variance on its own and top of

18         that, I need to do my -- I need to have a

19         landing that's 44 inches by 60, they will

20         reject it.  They have no jurisdiction over

21         the 44-by-60 dimension.  It will go to

22         court, get an approval from a judge that you

23         can do a 44-by-60 and then come back to us

24         so we will give you variances for our own

25         code.

1

2          Q.    Okay.  So let me ask you this:  If

3    Marcia Eskenazi, architect, changed her

4    proposed plan so it's a 5-foot-by-5-foot

5    landing, both in front of the store and at

6    the corner, then a variance -- a variance is

7    requested from the Department of

8    Transportation, it is possible that the

9    Department of Transportation can approve

10   that plan or recommend that plan.  Agreed?

11         A.    Yeah.  Yes, agreed.

12         Q.    And then if the landings are

13   changed to 5 foot by 5 foot, you would agree

14   that a waiver could be presented to the New

15   York City Department of Buildings to be able

16   to go further than 44 inches from the

17   building line and the Department of

18   Buildings can approve the proposed plan.

19   Agreed?

20         A.    That's giving the applicant

21   variance to go on two streets, not one.

22   And --

23         Q.    I'm asking, it's possible, right?

24   It's not --

25         A.    That's a possibility, yeah.

1

2          Q.   It's a possibility, there are

3    procedures --

4          A.   -- eliminate the cost factor, yes,

5    there's a possibility.

6          Q.   Okay.  So as long as the proper

7    procedures are followed and the proper

8    documentation is provided, you would agree

9    there's a possibility that both the

10   Department of Transportation can approve

11   this proposed plan, correct?

12         A.   Yes.

13         Q.   And the Department of Buildings

14   can approve this proposed plan, correct?

15         A.   Yes.

16         Q.   So you would agree with me, it's

17   not impossible that a proposed architectural

18   plan to build a ramp that wraps around from

19   108th Street to 48th Avenue at this location

20   can be submitted and recommended and

21   approved, correct?

22         A.   Correct.  It is not impossible to

23   have such application.

24         Q.   And the relevant authorities to

25   approve it would be the Department of

1

2       at this time on November 7th or later.

3           Q.   So you determined that that

4       measurement of the distance between a

5       proposed ramp and the curb to determine how

6       much space was on the sidewalk is an

7       important measurement, but not an important

8       measurement for you to take.

9               Is that your testimony?

10          A.   Yes.

11          Q.   Okay.  And it's an important

12      measurement because if this proposed plan is

13      going to get recommended by the Department

14      of Transportation, it's your testimony that

15      the Department of Transportation wants to

16      know how much space there is, correct?  On

17      the sidewalk?

18          A.   Of course.  Of course, they will

19      need to know how much space there is.

20          Q.   Okay.  Now, you also mentioned

21      something new just now about a land

22      surveyor, correct?

23          A.   Correct.

24          Q.   And you're saying that's another

25      obstacle to getting this proposed plan in

1

2          important, and you knew about it for six

3          weeks, correct?  The Department of

4          Transportation approving a proposed ramp, to

5          build a wraparound ramp at this corner

6          store?

7                  You would agree with me that you

8          knew it would be important for the

9          Department of Transportation to review this

10         plan?

11              A.   Yes.

12              Q.   And you knew about it on November

13         7th, 2023?

14              A.   I know about it on November 7th,

15         2023, yes.

16              Q.   And you thought about it for the

17         six weeks until you wrote your report on

18         December 22nd, 2023?

19              A.   Yes.

20              Q.   Now, if I told you that the words

21         "department of transportation" are not in

22         your report; would that surprise you?

23              A.   No.

24              Q.   Okay.  Did you think it might be

25         important to mention the Department of

1

2      Transportation if it is a hurdle and

3      difficulty?  Do you think it would be

4      important to mention it in your report?

5          A.   No.  Because we're not here to --

6      I was looking at a proposed plan and saying

7      that this will fix all the issues.  And the

8      proposed plan for the ramp, it does not fix

9      the issue.

10              So if that's like -- I'm not the

11     applicant on this.  I'm not going to give a

12     rundown of the process how to get this

13     approved.  I'm not hired to file for it.

14     What I was hired for was to evaluate:  Is

15     this ramp compliant with ADA or not?  No,

16     it's not.

17              Would the proposed ramp work or

18     does not work?  Is it legal and not illegal?

19     And, no, it would not work.

20         Q.   In your report -- in your report,

21     did you document that the existing ramp does

22     not comply with the ADA?

23         A.   Yeah.  On my report, we said that

24     it's not -- it's not made to be

25     ADA-accessible.

1

2            go back, would you be able to find the

3            word "advocate"?

4                  THE REPORTER:  I think you might

5            have heard -- I heard "applicant."

6                  MR. BERKE:  "Applicant"?

7                  THE REPORTER:  That's what I

8            heard.

9                  THE WITNESS:  Yes.

10                 MR. MIZRAHI:  I'm going to ask

11           that you lower your voice, please.  If

12           we can just continue.  We've wasted

13           enough time.

14                 THE REPORTER:  I can read the

15           question, but I think he said he's not

16           an "applicant."

17                 MR. MIZRAHI:  That's what I heard,

18           too, Madam Court Reporter.

19                 MR. BERKE:  We'll go forward.

20     BY MR. BERKE:

21           Q.  Mr. Demetry, you would agree with

22     me that in your report, you don't mention

23     that a land survey is required as part of

24     the process for this proposed ramp to be

25     approved.

1

2          Would you agree with me on that?

3          A.   Yes.  It's not mentioned.

4          Q.   Okay.  And you would agree with me

5     that you didn't mention in your report about

6     the possibility of a New York City

7     Department of Buildings waiver.  Agreed?

8          A.   Agreed.  Because I was not listing

9     a roadmap how to approve this proposed ramp.

10    That's not what I was discussing.  What I

11    was looking at for the ramp, it's not my

12    application to approve.

13         Q.   Did you not state in your report

14    this conclusion:  (As read) "Constructing

15    such a ramp would create illegal conditions

16    on the public situation endangering

17    pedestrians and would not achieve the

18    intended goal"?

19         A.   Yes.

20         Q.   So you considered -- by saying

21    this ramp, proposed ramp would create

22    illegal conditions, you were considering the

23    possibility, could this proposed ramp be

24    approved, correct?

25              MR. MIZRAHI:  Objection to the

1

2      60 inches, you still need approval from the

3      New York City Department of Buildings,

4      correct?

5           A.   Correct.

6           Q.   And it would still need approval

7      from the Department of Transportation,

8      correct?

9           A.   Correct.

10          Q.   And there's a New York City

11     building code that talks about landings and

12     that are 5 feet by 5 feet, that would need

13     approval from the Department of Buildings

14     and the Department of Transportation,

15     correct?

16          A.   Yes.

17          Q.   There's a New York City building

18     code 3201.9, called the "Department of

19     Transportation approval."

20               Are you aware of that code?

21          A.   Yes.

22          Q.   And that says: (As read) "Any

23     encroachments on public right-of-way that

24     exceeds the limitation provided for in this

25     chapter shall require the approval of the

1

2          Department of Transportation."

3                    Correct?

4          A.    Correct.

5          Q.    And in the New York City building

6     code 1101.3.5, the New York City building

7     code of 2022 spells out how to get a plan

8     approved, correct?

9          A.    Correct.

10         Q.    It spells out how to apply with

11    the Department of Transportation for a

12    recommendation, correct?

13         A.    Correct.

14         Q.    And so it spells out a possible

15    way of approval for this proposed plan by

16    Marcia Eskenazi, architect, correct?

17         A.    Correct.

18         Q.    Okay.  And it's your opinion if

19    this proposed plan, the landings were

20    changed to 5 feet by 5 feet, would that

21    improve its chances of approval?

22         A.    Yeah.  If the issues we had

23    mentioned earlier are addressed, it would

24    improve the chances of the approval at least

25    as far as it will be concerned, and then you

1

2          can go --

3                    Yeah.  It improves it; it makes it

4          according to the ADA regulation or

5          requirement.

6                Q.    Okay.  Now, when you wrote your

7          report, did you take care to mention all the

8          applicable New York City Department of

9          Buildings rules and regulations?

10               A.    Not section by section.

11               Q.    So you didn't -- you didn't

12         include section 1101.3.5. that's of the 2022

13         New York City Department of Buildings that

14         spells out how to get a proposed plan

15         approved when you need to go into

16         encroachment onto the sidewalk public

17         right-of-way, correct?

18               A.    No.

19               Q.    Okay.  And you didn't mention New

20         York City building code 1012.6 for ramp

21         landings, correct?

22               A.    For what again?

23               Q.    For ramp landings.

24               A.    Ramp landings.  No.

25               Q.    Right.  You agreed building code

1

2       1012.6 of the New York City building code

3       spells out the requirements for ramp

4       landings?

5            A.   If I could read; I don't have it

6       in front of me, and I don't know it by

7       heart.  So, yeah.

8            Q.   Okay.

9            A.   It sounds like the section is

10      right.

11           Q.   And then, also in -- you would

12      agree that New York City building code 2022

13      has a section of 3201.9 --

14           A.   Mm-hmm.

15           Q.   -- that talks about if a ramp is

16      in excess of the allowable 44 inches in the

17      public right-of-way, then DOT, Department of

18      Transportation, approval is required.

19                You're aware of that section of

20      the building code?

21           A.   Yes, yes.

22           Q.   And you didn't mention that

23      section of the building code in your report,

24      correct?

25           A.   Correct.

1

2          Q.   And those sections that I've just

3     cited, they talk about how to get a proposed

4     plan approved, correct?

5          A.   Correct.

6          Q.   And you didn't mention those

7     sections in your report, correct?

8          A.   No.  Because that wasn't what I'm

9     trying to accomplish.

10         Q.   Well, was part of your scope to

11    figure out if the existing ramp doesn't

12    comply with the ADA and if there are

13    opportunities to create a compliant ramp?

14              MR. MIZRAHI:  Objection to the

15         form of the question.

16              Hany, you can respond.

17              THE WITNESS:  Jason, I may respond

18         you said?

19              MR. MIZRAHI:  Yes, you can

20         respond.

21         A.   I was not supposed to design a

22    ramp.  I was supposed to look into the

23    existing ramp and the proposed ramp.

24    BY MR. BERKE:

25         Q.   So when you say that you were not

1

2          there is a possibility that this proposed

3          ramp could be approved.

4                    Would you agree with that?

5          A.    Yes.

6          Q.    Now, if I were to tell you that on

7          48th Avenue, the distance from the building

8          line to the sidewalk is 15 feet, do you have

9          any reason to dispute that number?

10         A.    No.

11         Q.    If I were to tell you on 108th

12         Street, the distance from the building line

13         to the curb is 18 feet, would you have any

14         reason to dispute that number?

15         A.    No.

16         Q.    If there is a 5 foot by 5 foot --

17         I'm sorry.

18                    A 5-foot-by-5-foot landing created

19         on the proposed ramp, if we start at 108th

20         Street, if we have a landing of that size

21         and there's 18 feet from the building line

22         to the corner, would you agree it's a math

23         problem where we do 18 feet minus 5?  That

24         leaves us 13 feet from a proposed

25         5-foot-by-5-foot landing to the 108th Street

1

2     curb?

3          A.   It would be less than 13 feet.

4          Q.   Well, we have --

5          A.   The curb, the curb is curbed at

6     the corner.

7          Q.   So how much less would you

8     approximate?

9          A.   I don't know, about 6 inches or

10    so.

11         Q.   Okay.  So if the building line is

12    18 feet on 108th Street to the curb and we

13    do a proposed landing of 5 feet by 5 feet,

14    then you're saying you will likely have

15    12 feet, 12 feet and 6 inches remaining for

16    the pedestrian traffic on the sidewalk?

17         A.   Okay. I agree.

18         Q.   Agreed.  Okay.

19              Then if we go to 48th Avenue and

20    the curb -- I'm sorry -- the building line

21    to the curb is 15 feet and we have a landing

22    at the corner of 48th Avenue and 108th, then

23    we do the math problem of 15 feet minus 5,

24    gets us 10 feet to the curb.  Correct?

25         A.   A little less than 10 feet.  Okay,

1

2       correct.

3              Q.   A little less.  You're saying by

4       about 6 inches, correct?

5              A.   More or less, yes.

6              Q.   So about 9 feet 6 inches for the

7       public to travel on the sidewalk, correct?

8              A.   Yes.

9              Q.   Now, are you aware that there's a

10      New York City Department of Transportation

11      manual that talks about how wide sidewalks

12      should be?

13             A.   Yes.

14             Q.   It's called "New York City

15      Department of Transportation Design Manual"?

16             A.   Yes.

17             Q.   And are you aware that they say

18      sidewalks should be 8 feet in width or the

19      greater number of what is half the width of

20      the sidewalk from the building to the curb?

21             A.   Yes.

22             Q.   So here on 108th Street, if we

23      have 18 feet from the street line to the

24      curb, half of that is 9 feet.  Would you

25      agree?

```
 1

 2          A.   Yes.

 3          Q.   And 9 feet falls within allowable

 4     space for pedestrians to travel on the

 5     sidewalk if we build a proposed landing

 6     that's 5 feet by 5 feet in front of 4801

 7     108th Street, correct?

 8          A.   Correct.

 9          Q.   And so the Department of

10     Transportation, if -- for this proposed plan

11     to be recommended, that's the calculation

12     the Department of Transportation would make

13     in that 9 feet of sidewalk, is that

14     sufficient space for the public?  Agreed?

15          A.   I have no clue.  That's their job.

16          Q.   Okay.  And then on 48th Avenue, if

17     we have a building line to curb distance of

18     15 feet and we take half of that, which is 7

19     1/2 feet, would you agree?

20          A.   Yes.

21          Q.   Okay.  So we do -- the building

22     line to the curb is 15 feet, and if a

23     proposed ramp is built with a

24     5-foot-by-5-foot landing, we do the math

25     problem of 15 minus 5 and we get to 10 feet
```

1

2          they come up with the 60 inches.  It's not

3          60, it's definitely less than 60.  But

4          that's where it projects out and then turns.

5          And that's why the ADA also has clearances

6          for under counters and under sinks, for the

7          feet, basically.  That's where it comes

8          from.

9               Q.   Okay.  But your average wheelchair

10         could be able to navigate within --

11              A.   Yes.

12              Q.   -- this -- this dimension of

13         44-inches-by-60-inches landing, correct?

14              A.   Correct.

15              Q.   It's possible?

16              A.   Yes.  It is possible.

17              MR. BERKE:  Okay.  Okay.  So we

18         can take down this.

19              And let's mark a new --

20         Plaintiff's 18.

21    (Whereupon, the aforementioned exhibit was

22    deemed marked as Plaintiff's Exhibit 18 for

23    identification as of this date.)

24    BY MR. BERKE:

25              Q.   Mr. Demetry, you refer in your

1

2          report to New York City Department of

3          Buildings application number 420596778.

4                A.   Yes.

5                Q.   And does that refer to work done

6          at the store location of Gio liquors that

7          was approved on July 24th, 2012?

8                A.   Yes.

9                Q.   It was approved by the Department

10         of Buildings on July 24th, 2012?

11               A.   Yes.

12               Q.   And Plaintiff's 18 shows that the

13         application was submitted and approved on

14         July 24th, 2012?

15               A.   Yes.  It was submitted on the 23rd

16         but approved on the 24th, yes.

17               Q.   Okay.  It was submitted by an

18         applicant of record, Jorge Bosch of Bosch

19         Architecture.

20               A.   Yes.

21               Q.   It was submitted on behalf of the

22         owner of 4801 108th Street of that building?

23               A.   Yeah.

24               Q.   Okay.

25                    MR. BERKE:  And, Court Reporter,

1

2          can you scroll down?

3    BY MR. BERKE:

4          Q.   On job type -- for 5, it says "job

5    types."  It was checked off, "alteration

6    type two."

7          A.   Okay.

8          Q.   Do you agree?

9          A.   Yes, correct.

10          Q.   And it was submitted to the

11   Department of Buildings because the

12   Department of Buildings requires these type

13   of applications for the type of work

14   described in the application?

15          A.   Yes.

16          MR. BERKE:  And can you scroll

17          down, Reporter, please.

18   BY MR. BERKE:

19          Q.   And this job application has a job

20   description?

21          A.   Yes.

22          Q.   And you had reviewed the job

23   description and you became familiar with it

24   when you wrote your report of December 22nd,

25   2023?

```
 1
 2          A.   Yes.
 3          Q.   And the job description states:
 4     (As read) "Application filed to complete job
 5     number 40122509444UG6, filed originally in
 6     2001.  Install security partitions with
 7     bulletproof glass and HVAC unit on first
 8     floor.  No change of use, egress or
 9     occupancy."
10               That's what it states, correct?
11          A.   Correct.
12          Q.   And this was an application for an
13     alteration at the store of the building,
14     correct?
15          A.   Yes.
16          Q.   And the job was to install
17     security partitions floor to ceiling within
18     the store?
19          A.   Yeah.  That's what it says here,
20     yes.
21          Q.   And also install bulletproof
22     glass?
23          A.   Yes.
24          Q.   And when you did your inspection
25     of the interior of the store in
```

1

2          November 7th, 2023, did you visually observe

3          with your own eyes the security partitions

4          that went from the floor to the ceiling?

5              A.   Yes.

6              Q.   And did you observe the

7          bulletproof glass?

8              A.   Yes.

9              Q.   Did you observe the bulletproof

10         door?  Did you know there was a bulletproof

11         door?

12             A.   Yes, yes.

13             Q.   And did you notice that the

14         security partitions from floor to ceiling

15         had converted the shape of the space

16         accessible to customers?

17             A.   I don't know what was the

18         original.  I didn't see it before.

19             Q.   Okay.  So if -- you never did an

20         investigation to see if the -- by adding the

21         security partitions in the interior of the

22         store, Gio liquors, if that cut off the

23         space accessible to customers; is that

24         correct?

25             A.   I don't know if it did or did not.

1

2       I don't know what was prior --

3          Q.   Okay.  So if the installation of

4       the security partitions cut off

5       approximately 40 percent of the space

6       accessible to the customers, would you say

7       that was an alteration to the store?

8          A.   Yes.

9          Q.   Okay.  Because the space

10      accessible to customers -- right? -- is

11      important in determining what access the

12      customers have, correct?

13         A.   Yes.

14         Q.   And it changes the selling space

15      of the store, correct?  The addition of

16      partitions changes the selling space of the

17      store?

18         A.   Yeah.  This is a business strategy

19      or behavior, whatever the business owner

20      service they provide.  Yeah, it changes the

21      behavior of the clients inside the store.

22      Okay.  Yes.

23         Q.   So you were inside the store on

24      November 7th, 2023.  Do you have a picture

25      in your mind of what the interior of the

1

2          store looks like?

3                  A.    Yes.

4                  Q.    And do you remember seeing the

5          security partitions and the bulletproof

6          glass?

7                  A.    Yes.

8                  Q.    Can you tell me how far in

9          distance from, let's say, when you enter the

10         store, if you look, turn to the left and you

11         hit the left wall -- I mean, if you're

12         facing the left wall, how far in distance is

13         it from the wall to the left to the security

14         partition closest to the middle of the

15         store?

16                 A.    Once I step into the -- once I

17         step into the store, there was a door in the

18         front -- not once, that's like 20 feet in at

19         least, if not more, maybe like 25 feet in

20         the store just right ahead.  And to the

21         left, there was a partition; and to the

22         right, there was a partition.

23                 Q.    So the available space for a

24         customer, how much width from partition to

25         partition?

1

2          A.    It's about maybe -- I don't know.

3    Just side to side from number, it's like,

4    12, 13 feet, left to right and probably

5    around 25 feet deep, more or less.

6          Q.    Okay.  And if I told you the store

7    dimensions are 26 feet wide, would you

8    agree?  The Gio store dimension is 20 feet

9    wide or 26 feet wide?

10         A.    I don't think so.  Because --

11         Q.    Because you have a door.  Right?

12   There's a door that goes upstairs?

13         A.    Yeah.

14         Q.    So what do you think are the

15   dimensions of the Gio Wine & Spirits store?

16         A.    The property is -- I don't

17   remember how wide was the property, the

18   property is 25 or 26 feet as it is.  You can

19   figure that's maybe 20 feet, maybe 21 feet,

20   19 feet.  I don't know.  I'm not sure

21   exactly the width of the store itself.

22         Q.    So we can -- it might be 20 feet?

23   Was that a --

24         A.    Okay.  Give or take 20.

25         Q.    Okay.  And as you walk into the

1

2          store from the entrance, you said there's an

3          aisle for customers to walk into?

4               A.   Yeah.  There is an aisle.

5               Q.   And you said that aisle goes

6          straight ahead for a distance?

7               A.   Yeah.  It goes in about maybe

8          20 feet.

9               Q.   Okay.

10              A.   From the floor in.

11              Q.   And what's that width of the aisle

12         for the customers?

13              A.   It starts about 12 or 13 feet, but

14         it gets a little narrow in the back.  I

15         don't recall exactly.  I didn't even measure

16         it.  It could be like a good six feet or

17         something, five feet.

18              Q.   You're saying the aisle for the

19         customers is five feet in width?

20              A.   Could be five or six feet, yeah.

21         And that's a small sectional.

22              Q.   On either side of that aisle are

23         the security partitions blocking off the

24         customers' access to the store, to the rest

25         of store?

```
 1
 2          A.   Yes.
 3          Q.   Okay.  And given the -- when you
 4     were in the store and you looked at the
 5     store dimensions, security partitions, how
 6     do they allocate the space between the
 7     customer and for store -- the store
 8     personnel, what percentage of the total
 9     space would you say is the division between
10     where the customers have access to and --
11     you know, with the partitions and then what
12     the store owner or the store personnel have
13     access to?
14          A.   My -- I really don't know because
15     I didn't measure up the store.  I didn't
16     even walk into -- behind the partition glass
17     to see what's behind it.  So I can't have --
18     I'm describing the space that I was actually
19     in, and this is just numbers off how it
20     felt, not how it was measured because I
21     didn't measure it.
22          Q.   Well --
23          A.   Everything, every single bottle of
24     liquor is behind the partition glass.  You
25     can't access anything.  You can just go
```

1

2      input your order, and they prepare it and

3      bring it to you.

4           Q.   Is it fair to say that most of the

5      space is devoted to the sales personnel and

6      the storage of liquor behind the partitions?

7           A.   Yes, that's true.

8           Q.   And would you say more than

9      60 percent of the space is devoted to the

10     storage of liquor and the sales personnel

11     behind the partitions?

12          A.   I will assume 60 percent is okay

13     number.  Yes.

14          Q.   Okay.  And that means only about

15     40 percent available for the customers,

16     correct?

17          A.   Yes, that would be about

18     40 percent.  As -- again, this is an

19     assumption.

20          Q.   And if -- before the application,

21     July 24th, 2012, and before any construction

22     was started in the store, if it was open

23     space, then the partitions have reduced the

24     space for the customers.  Is that agreed?

25          A.   If it was open, then, yes, they

1

2          changed their business model and made it

3          less.

4                    MR. BERKE:  Okay.  Now I'm going

5               to ask the court reporter, can we go to

6               a document called HPD and call it

7               Plaintiff's 19.

8          (Whereupon, the aforementioned exhibit was

9          deemed marked as Plaintiff's Exhibit 19 for

10         identification as of this date.)

11         BY MR. BERKE:

12              Q.   Mr. Demetry, do you recognize this

13         as a New York City Department of Buildings

14         index card for 108th Street at the address

15         of 4801?

16              A.   Yeah.  It's not Department of

17         Buildings, it's Housing Preservation

18         department.

19              Q.   Housing Preservation and

20         Development.

21              A.   HPD, yes.

22              Q.   And you see the date on this, it

23         says '36, 1936?

24              A.   Yes, November 24, 1936.  Yes.

25              Q.   All right.  So let's scroll down

1

2          if we can.  This is Plaintiff's 19.

3                    What we're looking at now, the

4          date on the bottom says November 24, 1936;

5          is that correct?

6               A.   Yes, correct.

7               Q.   And it looks like it was signed by

8          an Inspector Leahy, L-E-A-H-Y; is that

9          correct?

10              A.   Yeah, it looks like it.

11              Q.   And do you see it has the street

12         names, 48th Avenue and 108th Street?

13              A.   Mm-hmm, yes.

14              Q.   Do you recognize this as a

15         corner -- I'm sorry.  Do you recognize this

16         as a picture layout of the building at 4801

17         108th Street?

18              A.   Yes.

19              Q.   And if you look at the entrance,

20         does that entrance on 108th Street look like

21         the entrance that's there today?

22              A.   Yes.

23              Q.   And do you see where it says

24         "grocery store"?

25              A.   Yes.

1

2      Q.   And that shows an open space in

3  this store?

4      A.   Yes.

5      Q.   And do you see red writing that

6  says "part removed"?

7      A.   Yes.

8      Q.   It has a date.  And I don't know

9  if we can clarify that date.  Does it look

10  like September 14, '38?

11      A.   Yes.

12          MR. BERKE:  And, Reporter, if you

13          can scroll down so he can see the rest

14          of the drawing.

15  BY MR. BERKE:

16      Q.   Does it look like partitions were

17  removed in '38?

18      A.   Yes.

19      Q.   Okay.  And so that store had open

20  space from 1938?

21      A.   Yes.  I mean, they made a kitchen

22  in the back.

23      Q.   And they made a kitchen in the

24  back.

25          So if there's no other plans on

1

2      file with the New York City Department of

3      Buildings, could we infer that in 1938 there

4      was open space for the storefront -- for the

5      store at 4801 108th Street?

6            A.   Yes.

7            Q.   And then the application was first

8      made in 2001 to install security partitions?

9            A.   If it stayed the same throughout

10     all these years, yes.  In 2001, they started

11     the partitions part.

12           Q.   In 2001, an application was filed

13     and approved on August 14, 2001, to start

14     building partitions?

15           A.   Yes.

16           Q.   And that was an Alteration Type 2

17     document that was filed with the New York

18     City Department of Buildings, correct?

19           A.   Correct.

20           Q.   And then construction took a while

21     and had -- and in July 24th, 2012, another

22     application was filed for the same type of

23     construction, correct?

24           A.   Yeah.  That application that was

25     put on the screen previously, that's to wrap

1

2          up and obtain sign-offs.  Because in that

3          period of time, the Department of Buildings

4          changed the system from just paper system

5          into the BIS system, the Building

6          Information System.

7                    So the first application cannot be

8          reinstated and reopened and signed off.  So

9          that's why this is common that you would see

10         applications just to wrap it up and get it

11         signed off.  That's why he filed it on

12         July 23rd, he got an approval on July 24th,

13         and that signed it off right away.

14              Q.   Was that signed off on May 21st,

15         2013?

16              A.   Yeah.  So, probably, they had

17         extra work or whatever.  They had to get a

18         contractor to get a new permit, whatever the

19         case is.  I'm not going to speak for anyone.

20              Q.   I'm saying, would you agree, if we

21         go back to the document that we were looking

22         at, it was signed off on May 21st, 2013?

23              A.   Yes.  Yeah, yeah, yeah.

24              Q.   Okay.

25                    MR. BERKE:  We can put this one

```
 1
 2          down, Reporter.
 3     BY MR. BERKE:
 4          Q.   Now, Mr. Demetry, you're aware
 5     that in 2010, there were Americans with
 6     Disabilities Act advisory guidelines issued?
 7          A.   Yes.
 8          Q.   And those went into effect
 9     March 15, 2012?
10          A.   Yes.
11          Q.   And the application that was
12     submitted for work done at the Gio liquor
13     store in 2012 was submitted in July 23rd,
14     2012, and approved July 24th, 2012?
15          A.   Yes.
16          Q.   And so from March to July --
17     that's April, May, June -- that's four
18     months later after March 15, 2012?
19          A.   Yes.
20          Q.   So are you familiar with the 2010
21     ADA advisory guidelines section 202.4
22     regarding alterations affecting primary
23     function areas?
24          A.   Yes.
25          Q.   Do you have a copy of that in
```

1

2          front of you?

3                  A.    Of the guidance?

4                  Q.    Yes.

5                  A.    No, not right now.  But I'm

6          familiar with it.

7                  Q.    If I read it to you, would you

8          recognize the wording of the document, or do

9          you want to see in front of you?

10                 A.    No, no.  You can read it.

11                 Q.    So:  (As read) "202.4, alterations

12         affecting primary function areas, in

13         addition to the requirements of 202.3, an

14         alteration that affects or could affect the

15         usability of or access to an area containing

16         a primary function shall be made so as to

17         ensure that to the maximum extent feasible,

18         the path of travel to the altered area,

19         including the restrooms, telephones and

20         drinking fountains serving the altered area,

21         are readily accessible to and usable by

22         individuals with disabilities, unless such

23         alterations are disproportionate to the

24         overall alterations in terms of cost and

25         scope as determined under criteria

 1

 2      established by the Attorney General."

 3              And then it says:  (As read) "In

 4      existing transportation facilities and area

 5      of primary function shall be defined under

 6      regulations published by the Secretary of

 7      the Department of Transportation or the

 8      Attorney General."

 9              Do you recognize that section of

10      the advisory guidelines?

11          A.   Yes.

12          Q.   So, it says:  (As read) "An

13      alteration that affects the usability of a

14      primary function area."

15              Is the sales space of a liquor

16      store a primary function area?

17          A.   Yeah.

18          Q.   Is alteration of this store, filed

19      in July 23rd and approved on July 24th,

20      2012, with an application to alter the

21      primary function area of this store by

22      installing secure partitions from floor to

23      ceiling and installing security glass?

24          A.   I cannot say that it fit --

25      altered it to the extent that's needed to

1

2          trigger this section.  Because the job was

3          basically done in 2001, and then it was

4          wrapped up in July 2012, and it was reviewed

5          by a planning examiner in the Buildings

6          Department.  This is not a professional

7          certification job; this is a regular

8          planning exam job.

9                  So he looked at it.  He looked at

10         the plans, and he accepted it with the cost

11         with whatever criteria.  And then the

12         Department of Buildings signed it off, with

13         someone taking responsibility of inspections

14         on this application.  So they are in

15         compliance with the approved plans on the

16         job.

17            Q.   Well, are you aware that the New

18         York City Department of Buildings

19         considers -- well, I'm sorry.  Let me

20         withdraw that.

21                 Does the New York City Department

22         of Buildings consider a job complete when

23         it's signed off by the New York City

24         Department of Buildings?

25            A.   Yes.

 1

 2         (As read) "If there's an alteration that

 3         affects the usability of or access to an

 4         area containing a primary function, the

 5         alterations shall be made to the maximum

 6         extent feasible so that the path of travel

 7         to the altered area can be access -- readily

 8         accessible and readily usable by individuals

 9         with disabilities."

10              You -- so now I'm going to ask you

11         a question about that provision.  "Maximum

12         extent feasible," what does that mean?

13         A.   Maximum extent -- as far as I

14         understand it, maximum extent feasible to

15         the project.

16              There are certain criteria in the

17         building code that if you pass a certain

18         limit of the value of the proposed work

19         compared to the value of the building, then

20         you have to have everything in the code

21         applicable so --

22         Q.   Let me ask you this -- let me ask

23         you this on that point:

24              202.4 says:  (As read) "If an

25         alteration is made to a primary function

1

2          area, then the path of travel shall be made

3          readily accessible to and usable by

4          individuals with disabilities to the maximum

5          extent feasible."

6                   What does that mean to make it

7          usable and accessible by individuals with

8          disabilities to the maximum extent feasible?

9          A.    To the maximum extent feasible, if

10         it's -- if it's possible.  The maximum -- if

11         there's a possibility of making this ADA

12         accessible route, then it has to be done.

13         Q.    Okay.

14         A.    And it's determined by the cost of

15         the job compared to the value of the

16         construction of the building.

17         Q.    Okay.  So let's take a look --

18         there was a filing with the Department of

19         Buildings in the year 2013 -- I'm sorry --

20         in the year 2012 in July that was approved

21         and was finally signed off in the year 2013,

22         agreed?

23         A.    Agreed.

24         Q.    Now, you agree that that was an

25         Alteration Type 2 document filed with the

1

2        Department of Buildings, correct?

3            A.   Agreed that it's an alteration to

4        what again?

5            Q.   It was an Alteration Type 2 that

6        was filed.

7            A.   Yes.

8            Q.   With the Department of Buildings,

9        agreed?

10           A.   Yes.  That's the type of

11       application you need, yes.

12           Q.   And you agreed that it involved

13       the usability of a primary function of the

14       area, agreed?

15           A.   Yes, agreed.

16           Q.   Okay.  And now I'm asking you, the

17       ramp, the existing ramp, can that be

18       considered a path of travel to the store?

19           A.   Currently, it has to be a path of

20       travel to the store.  That's the only path

21       of travel to the store.

22           Q.   Okay.  And if there was a -- do

23       you agree with me on this point:  If there

24       was alteration that affected the usability

25       or access to an area containing a primary

1

2          and says not is a disproportionate cost?

3                  A.   I don't have that cleared up.

4                  Q.   Okay.  So one of the conditions

5          involves cost, correct?

6                  A.   Correct.

7                  Q.   And it's an evaluation and it's a

8          balancing test -- right? -- to see if the

9          costs to make the path of travel accessible

10         are disproportionate to the overall cost of

11         alterations, correct?

12                 A.   Correct.

13                 Q.   In 2012, when the application was

14         filed with the New York City Department of

15         Buildings, the type 2 alteration

16         application, do you know what the costs were

17         identified in that application?

18                 A.   48,000 and change.  I don't

19         remember.

20                 Q.   Would you agree that it was

21         $48,690?

22                 A.   Yes.

23                 Q.   That was a cost affidavit, PDW3

24         cost affidavit filed with the Department of

25         Buildings for the project in July 2012?

1

2       it minus 600?

3              Q.   So if I do the math.

4                   Okay.  48,690 times point 20.

5       Would you agree that 9,738 is 20 percent of

6       48,690?

7              A.   Yes, I agree.

8              Q.   Okay.  So the attorney general is

9       saying -- I'm sorry.

10                  If the 2010 ADA advisory

11      guidelines state that if the cost is below

12      20 percent, it is not disproportionate,

13      agreed?

14             A.   Yes, agreed.

15             Q.   And so if $9,600 is spent to make

16      the path of travel accessible, and that is

17      less than 20 percent, that makes it

18      20 percent or less of the total cost that

19      was spent on these alterations, agreed?

20             A.   Agreed.

21             Q.   Okay.  In your report, you didn't

22      put any cost figures of what it would cost

23      to make the existing ramp more accessible

24      for people with disabilities, agreed?

25             A.   Agree.

1

2          Q.   Got it.

3               Are you aware of a provision in

4     the ADA that states that the date of an

5     alteration is the last date that it was

6     approved by a local building department?

7     Are you aware of that ADA advisory

8     guideline?

9          A.   Yes.

10         Q.   Okay.  And here, the last date was

11    in the year 2013, that the application for

12    an Alteration Type 2 work was finally

13    approved by the New York City Department of

14    Buildings, correct?

15         A.   Yes.  Referencing another job

16    number that was previously approved for them

17    that they were completing it.

18         Q.   So the -- according to the ADA,

19    the date that it was approved in March or

20    May of 2013 is the date that the ADA looks

21    as the compliance date, correct?

22         A.   No, no.  That's a sign-off date,

23    not approval date.  Approval is approval of

24    the application.  Sign-off is completion of

25    all work.

1

2    with the New York City Department of

3    Buildings rule where as-of-right there may

4    be a 44-inch encroachment onto the sidewalk,

5    correct?

6         A.   This will not make the Department

7    of Buildings accept it. The code is --

8         Q.   Say that again?

9         A.   This will not make the Department

10   of Buildings accept it because there's a

11   limitation of 44 inches.  Forget about the

12   limitation, because DOT will just agree that

13   DOT accepts the ramp with the 5 feet by 5

14   feet -- or no without the 5 feet -- that the

15   DOT accepts the ramp.

16            All right.  Now we go back to the

17   Department of Buildings.  The Department of

18   Buildings will never approve this ramp

19   because it doesn't comply with ADA

20   measurements, and this is not their

21   jurisdiction.

22        Q.   So you're saying that it's never

23   going to happen; is that correct?

24        A.   It will never going to happen

25   unless there's a federal court giving the

1

2          okay to modify this dimension to 44 inches

3          by 60.

4                Q.   Okay.  So there are two options:

5          It could be a 60-by-60-inch landings --

6          right? -- that could be submitted; or it

7          could be a proposed ramp with 43-by-60-inch

8          landings.

9                     The decision is to be made by the

10         Department of Transportation and the

11         Department of Buildings, correct?

12               A.   Correct.

13               Q.   And it may be reviewed by a Court

14         at some time in the future, is what you're

15         saying, correct?

16               A.   Yes, correct.

17               Q.   And in your opinion, you don't

18         think a ramp -- a proposed ramp that's

19         60-by-60-inch landings will ever be approved

20         by the Department of Transportation or by

21         the New York City Department of Buildings or

22         by a federal court?

23               A.   60-by-60 landings, it has a

24         possibility, it has a chance to be approved.

25                     60 by 44, the Department of

1

2          Buildings will not approve it unless a court

3          order comes in accepting this as ADA means.

4               Q.   So you're saying in -- chances go

5          up and improve if the landings are changed

6          to be 60 inch by 60 inch, correct?

7               A.   Yes.

8               Q.   And you're saying the odds go up

9          for the Department of Transportation

10         approving it?

11              A.   No.  The Department of

12         Transportation is the Department of

13         Transportation.  For both sections, I really

14         don't know because we did not go this far

15         with wrapping a ramp around any corner

16         building.  And there's a reason why you

17         don't see them.

18              Q.   When you say "we didn't go this

19         far" --

20              A.   It's not feasible --

21              Q.   Let me see if I understand when

22         you say "we didn't go this far."  You mean

23         Sotir Associates in its past projects?

24              A.   Yes.

25              Q.   In your past projects, you're

1

2      saying you never submitted an application to

3      the Department of Transportation to build

4      a -- to get a recommendation for this type

5      of ramp?

6            A.   For a ramp -- for a ramp wrapping

7      around a building on two streets?  No.

8            Q.   Okay.

9            A.   No building owner --

10           Q.   Did you ever -- did you, Sotir &

11     Associates, ever submit an application like

12     this to the New York City Department of

13     Buildings to get a ramp that wraps around

14     from one street to another street around a

15     corner?

16           A.   No.

17           Q.   Okay.

18           A.   No building owner accepts the fees

19     that comes with this.  Never.  It's more

20     than the reconstruction of this whole store

21     start to end.

22           Q.   Now, in your report that you

23     created on December 22nd, 2023, at that

24     time, you knew what the costs were of the

25     construction of the store, correct?

1

2          A.   Of the store?

3          Q.   Yeah.  You said the construction

4     costs 48,000, correct?

5          A.   Yeah, that was on the application.

6          Q.   When you wrote your report, you

7     knew those costs, correct?

8          A.   Yeah.

9          Q.   And in your report, you never

10    specified that the costs of building the

11    proposed ramp will exceed the costs of

12    48,690, correct?  You didn't write that in

13    your report.

14         A.   No, we didn't.

15         Q.   Now, when it comes to the words

16    "technically infeasible," does -- hold on.

17    I'm sorry.  Let me withdraw that.  Give me

18    one second.

19              When it comes to the word

20    "technically infeasible," that can mean

21    difficulty because of a structural issue,

22    correct?

23         A.   Correct.

24         Q.   But we don't have a structural

25    issue here, correct?  We're not removing a

1

2          structural barrier to create the proposed

3          ramp, agreed?

4               A.   For the ramp option, no, we're not

5          removing any structure.  Yes, agreed.

6               Q.   Okay.  Here you had defined it as

7          technical infeasibility because you are of

8          the opinion that this proposed ramp will

9          never be approved by the Department of

10         Transportation or New York City Department

11         of Buildings; is that correct?

12              A.   That's correct.

13              Q.   And if this proposed ramp, the

14         landings are changed to 60 inches by

15         60 inches, do you still have the opinion

16         that it's technically infeasible for this

17         ramp to get built?  The proposed ramp?

18              A.   Yes.

19              Q.   Okay.  And that's because you're

20         saying it's a difficult process?

21              A.   Yes.

22              Q.   And you have not personally went

23         through that process; is that correct?

24              A.   No.  In this format, no.

25              Q.   And Sotir & Associates has never

1

2      gone through this process, correct?

3           A.   No.

4           Q.   So you, nor Sotir & Associates,

5      has real world experience of going through

6      the process of trying to get a proposed

7      ramp, a ramp that wraps around the corner,

8      to be approved -- or recommended by the

9      Department of Transportation or approved by

10     the New York City Department of Buildings,

11     correct?

12          A.   A ramp in this format, no.

13          Q.   And if we change the format and we

14     made the ramp with landings of 60 inch by 60

15     inch, you personally don't have the

16     experience of going to the Department of

17     Transportation to ask for it to recommended,

18     correct?

19          A.   Yeah, by -- when I said in this

20     format, I mean in this format of wrapping

21     around the building on both streets.

22               But we have the field experience

23     with DOT and the Department of Buildings

24     with variances and with projections more

25     than 44 inches and all that.

1

2          Q.   And tell me, what project were you

3     working on where you had to go to the

4     Department of Transportation for a

5     recommendation for an encroachment on the

6     sidewalk?

7          A.   We have construction -- we have

8     building fences that are encroaching and

9     everywhere in Bayridge and --

10         Q.   What address?

11         A.   -- Brooklyn.

12         Q.   What address?

13         A.   78th Street, that's 35 78th

14    Street.  We had to go through the Department

15    of Transportation for that.

16         Q.   When you say "35 78th Street," 35

17    is the building number?

18         A.   Yes.  78th Street is the street on

19    Bayridge, Brooklyn.

20         Q.   And do you know what the cross

21    street is?

22         A.   Shore Road, if I'm not mistaken.

23         Q.   Okay.

24         A.   No, it's not Shore Road.  It's

25    Narrows.

1

2          Q.    Narrows?

3          A.    Narrows, yeah.

4          Q.    And you submitted an application

5    to the Department of Transportation for

6    encroachment on the sidewalk?

7          A.    Yes.

8          Q.    And was it approved?

9          A.    Yes.

10         Q.    Okay.  And did it take them six

11   months to approve it?

12         A.    Yeah.  It took a year and four

13   months.

14         Q.    Okay.  What period of time -- when

15   did you submit the application?  What years?

16         A.    No.  I don't have details of the

17   dates because the job got a certificate of

18   occupancy, I believe, in 2019 or '20.  So

19   it's between -- I would say between 2016 and

20   '18 or '19, the application.

21         Q.    Okay.  And was there ever another

22   project that you worked on to ask for --

23         A.    There are a couple.  Honestly

24   speaking, at this point, this is the first

25   one that jumped in my head.

1

2        Q.   Okay.  So do you remember another

3   experience or no?

4        A.   I remember other experiences with

5   fences, not with -- there's no experiences

6   with ramps.

7        Q.   Okay.  So when you -- so how many

8   times, in general, have you submitted it to

9   the Department of Transportation for an

10   approval for encroachment on the sidewalk

11   for a fence?

12        A.   I don't have a count, but it's

13   more than five.

14        Q.   More than five.

15             And how many of those five were

16   approved by the Department of

17   Transportation?

18        A.   They were approved four times.

19        Q.   Okay.  And one time.  So one out

20   of five it was not approved?

21        A.   I remember it was a fence that was

22   not approved, and we had to push it back.

23        Q.   Was it eventually approved?

24        A.   No, not that I know of.  Let me

25   put it this way, maybe we did it afterwards,

1

2          not that I know of.

3                Q.   It left your office?

4                A.   No, it didn't leave the office.

5          The job got signed off and we're done.  Our

6          contract was over.  So if the owner pursues

7          it somehow, some other way, it's up to them.

8                Q.   Okay.  And what about any

9          applications to the New York City Department

10         of Buildings for a waiver?  Have you

11         personally ever been involved in that?

12               A.   Variances, yes.

13               Q.   Okay.  How many times, roughly?

14               A.   Not a lot for so many different

15         reasons, so I don't have a count.

16               Q.   Roughly.  Can you give me like 10,

17         20?

18               A.   At least 20.

19               Q.   Okay.  And how many times did you

20         successfully obtain a variance from the New

21         York City Department of Buildings?

22               A.   I would say it's a 99-percent

23         success.

24               Q.   Okay.

25               A.   I can't measure this against that.

```
 1

 2          A.   No.  Because that doesn't mean

 3     that I could comply with two aspects of the

 4     ADA code, but I cannot provide a bathroom

 5     inside; so it's okay if I leave out the

 6     bathroom, just give me the entrances.  No.

 7     It -- they don't -- it doesn't work this

 8     way.

 9          Q.   So to make something readily

10     accessible to the maximum extent feasible,

11     would you agree that means it doesn't have

12     to be 100 percent compliance, but something

13     a little less can still be to the maximum

14     extent feasible?

15          A.   No.

16          Q.   You don't agree?

17          A.   I don't agree.

18          Q.   Okay.  You determined that, in

19     your conclusion, that constructing such a

20     proposed ramp would create illegal

21     conditions on the public sidewalk,

22     endangering pedestrians.

23              That was your statement, agreed?

24          A.   Agreed.

25          Q.   And that is -- you said that's a
```