# **EXHIBIT 7**

```
                                                                    1

1    IN THE UNITED STATES DISTRICT COURT
     IN AND FOR THE EASTERN DISTRICT OF NEW YORK
2    ------------------------------------------X
     LEONID TREYGER,
3
                          Plaintiff,
4            -against-
                             CASE NO.:
5                            #23-cv-2099-HG

6    GIO WINE & SPIRITS CORP, GBA 526 LLC,

7                         Defendants.
     ------------------------------------------X
8
             Zoom Videoconference
9            Remote
             New York, New York
10
             DATE: December 11, 2023
11           TIME: 11:23 A.M.

12

13      DEPOSITION of GIOVANNI GUTTIERREZ, a Defendant

14   herein, taken by the Plaintiff, pursuant to Article 31

15   of the Civil Practice Law & Rules of Testimony, held

16   remotely, before GABRIELLA TUTINO, a Stenographic

17   Reporter and Notary Public of the State of New York.

18

19

20

21

22

23

24

25
```

1        MR. SWETNICK: When you say he owned it, he
2   operates the store. He doesn't own the building.
3        Q.   So, are you familiar with a company called Gio
4   Wine & Spirits Corp?
5        A.   Yes, that's my corporation.
6        Q.   Do you own it?
7        A.   Yes. The corporation, not the building.
8        Q.   Right, the corporation?
9        A.   The store.
10       Q.   Are you the sole owner of that corporation?
11       A.   Yes.
12       Q.   Does Jose Guttierrez have any involvement with
13  that corporation?
14       A.   No.
15       Q.   That corporation, Gio Wine & Spirits Corp, it
16  leases the store location at 48-01 108th Street?
17       A.   Yes.
18       Q.   For how long has it done that?
19       A.   Since 2007.
20       Q.   Before Gio Wine & Spirits Corp entered into a
21  lease for that store location, did you ever work at that
22  store location?
23       A.   No.
24       Q.   Had you seen that store location before Gio
25  Wine & Spirits Corp entered into a lease?

1    A.   Yes.
2    Q.   Okay. Was it a liquor store before Gio Wine &
3 Spirits?
4    A.   Yes.
5    Q.   Was that liquor store owned by Cesar Carbajal?
6    A.   Yes.
7    Q.   It was called Cesar's Liquors?
8    A.   (No response).
9    Q.   Yes? Just out loud so she can take the answer.
10 For how long was that store Cesar's Liquors?
11   A.   I don't know.
12   Q.   Before Cesar's Liquors, was there a laundromat
13 at that location?
14   A.   Yes.
15   Q.   Was Cesar's Liquors in business starting in
16 the year 2001? After the millennial, after the year
17 2000?
18   A.   I don't know, I don't know when he start.
19   Q.   So you saw that that store was a laundromat
20 before it became a Cesar's Liquors?
21   A.   Yes.
22   Q.   And, do you remember what that store was
23 before it was a laundromat?
24   A.   Before, a liquor store.
25        MR. SWETNICK: He's asking before it was a

12

1  laundromat, do you know what was there?
2           THE WITNESS: No.
3      Q.   When it was a laundromat did you ever use that
4  laundromat?
5      A.   Yeah.
6      Q.   Because it was a few blocks away from your
7  house?
8      A.   Yes.
9      Q.   How often did you use that laundromat?
10     A.   I don't know, my wife usually go. Not me.
11     Q.   Your wife would use the laundromat, okay. In
12 year 2001, did that laundromat become the liquor store?
13          MR. SWETNICK: Do you know.
14     A.   I don't know.
15     Q.   Did Cesar Carbajal own the laundromat?
16     A.   I guess. I don't know how to answer the
17 question now. I guess he was the owner.
18     Q.   Did you know he was an owner, that Cesar
19 Carbajal owned a corporation called 108th Street Launder
20 Center Inc.? You ever hear that name, 108th Street
21 Launder Center Inc.?
22     A.   No.
23     Q.   Do you have any reason to doubt that Ceser
24 Carbajal owned 108th Street Launder Center Inc?
25          MR. SWETNICK: Objection to form. He has no

1    A.   My son.
2    Q.   That's your son?
3    A.   Yes.
4    Q.   How old is he?
5    A.   He's 20.
6    Q.   When you first entered the lease, was the ramp
7    in front of the store present?
8    A.   Yes.
9    Q.   Was it in the same condition it is in today,
10   more or less?
11   A.   Yes, same thing.
12   Q.   That lease that you first entered into was a
13   10 year lease from 2007 to year 2017; is that correct?
14   A.   Yes.
15   Q.   Then there was another lease you entered into;
16   is that correct?
17   A.   Yes.
18   Q.   That next lease you entered into was in year
19   2017?
20   A.   Yes.
21   Q.   That next lease takes you to what year, how
22   many years is that second lease?
23   A.   2017 to 2027.
24   Q.   Okay.  That's your current lease?
25   A.   Yes.

19

1  Q. And, are there cement pillars in the basement
2  that support the structure?
3  A. I don't understand what you mean, cement
4  pillars.
5  Q. Any concrete or cement?
6  A. There's cement down there, in the basement.
7  Q. In the basement it's all cement?
8  A. There's concrete, yes.
9  Q. The walls are concrete?
10 A. Yes.
11 Q. Do you have insurance coverage for the store?
12 A. Yes.
13 Q. Does that insurance coverage also cover this
14 lawsuit, the defense of this lawsuit?
15 A. If it happened inside the store.
16 Q. Do you know, you're involved now in a lawsuit,
17 correct, that involves Leon Treyger?
18 A. Yes.
19 Q. You received a complaint by mail?
20 A. Yes.
21 Q. Did you notify your insurance company when you
22 received the complaint? Is the insurance company
23 covering this claim?
24 A. I do report to them but I mention to one of
25 the agents and he said, it's nothing to do with outside.

```
                                                              20

 1   Anything happen inside the store, they're responsible.
 2   So that's why I didn't.
 3        Q.   In 2007 when Gio Wine & Spirits signed the
 4   lease, did you inspect the store?
 5        A.   Yes.
 6        Q.   Okay.  Did you hire anyone to help you inspect
 7   the store at that time?
 8        A.   No.
 9        Q.   Before the purchase?
10        A.   No.
11        Q.   Did you hire an architect or an engineer or
12   anyone to help you inspect the store?
13        A.   No.
14        Q.   At the time when you first signed the lease,
15   was there concrete in the basement?
16        A.   Yes, it's concrete downstairs, yes.
17        Q.   Now, do you have a software system that you
18   use to track inventory?
19        A.   No.
20        Q.   Do you have a point of sale system?
21        A.   No.
22        Q.   Do you use a computer to track inventory or to
23   track business?
24        A.   Yes.
25        Q.   Do you have a computer that tracks sales?
```

| | |
|---|---|
| 1 | track? |
| 2 | A. By the end of the night with a close out. |
| 3 | Q. At the end of the night, what do you do to |
| 4 | keep track of it? Do you write it down on a piece of |
| 5 | paper, do you enter the information in a computer, do |
| 6 | you use a software program; how does Gio Wine & Spirits |
| 7 | Corp in year 2023 keep track of sales? |
| 8 | A. The way I do because I'm not, I'm not doing it |
| 9 | on the computer. We look at what we sell and that's it. |
| 10 | Q. You do it on the computer? |
| 11 | A. No. |
| 12 | MR. SWETNICK: He said no. |
| 13 | Q. How do you do it? |
| 14 | A. Manually. |
| 15 | Q. When you say manually keep track of sales, do |
| 16 | you handwrite how much liquor was sold that day and what |
| 17 | amount of money was collected? |
| 18 | A. I don't keep that record. |
| 19 | Q. I can't hear you? |
| 20 | A. I'm keeping that record of how much is selling |
| 21 | a day. |
| 22 | Q. You don't keep the records? |
| 23 | A. No. |
| 24 | Q. So you don't keep it by the day. Do you keep |
| 25 | records by the week how much liquor Gio sold? |

29

1     A. Well, once in a while I do it on the weekend.
2 It's only me and my son. I don't have to keep everything
3 organized and keep a record. I just keep the record
4 when you got somebody else to see what's going on.
5     MR. BERKE: Can you read that back.
6     (Whereupon, the last question was read back.)
7     Q. Let's put it this way. Does Gio Wine & Spirits
8 follow a course of conduct where it regularly keeps
9 records of the sale of liquor?
10     A. No, I don't.
11     Q. You do not, okay. Now, as part of owning a
12 liquor store, for each sale of liquor do you have to
13 collect tax?
14     A. Yes.
15     Q. From New York State. How do you record how
16 much tax is owed?
17     A. When I send the invoice to my accountant.
18     Q. Say that again, speak louder if you could?
19     A. When I get the invoice, I send it to the
20 accountant and he know how much I reported, and how much
21 sale I got to pay.
22     Q. So, when you say when you get an invoice, is
23 that an invoice number for you purchasing liquor?
24     A. No, for the company.
25     Q. I apologize. When you say you get an invoice,

39

```
 1   shows how much liquor you sold in year 2022?
 2        A.    Yeah, I do, yes.
 3        Q.    What kind of records do you have?
 4        A.    The accountant have it.
 5        Q.    Great.  Who is your accountant?
 6        A.    Javier.  I don't have his number right now.
 7        Q.    What's his last name?
 8        A.    I don't know it just now. I don't know his
 9   name. Javier, that's it.
10        Q.    How would I find him?
11        A.    Well, I don't have his number with me right.
12        Q.    You have a phone, you have his number in your
13   cell phone?
14        A.    No, I don't have.
15        Q.    How did you find him? Do you know where his
16   office is?
17        A.    Yes, I know where the office.
18        Q.    Where's the office?
19        A.    I don't know the address but I know where it
20   is.
21        Q.    So where is it?
22        A.    It's in Queens, Corona.
23        Q.    Corona, what street?
24        A.    104.
25        Q.    104th Street and what cross street?
```

40

1    A.    Roosevelt and 41st Avenue.
2    Q.    Do you know the name of the accounting office?
3    A.    Javier.
4    Q.    It's just call Javier Accounting?
5    A.    No, no, the office. I don't know if it's
6  something like that.
7    Q.    So you would know how to find the information
8  and give it to your lawyer, the phone number and address
9  of the accountant?
10   A.    Yeah.
11   Q.    And if you agree to give up your records you
12 would agree to allow the accountant to give up the
13 records?
14         MR. SWETNICK: You can't ask him that, you
15 know that.
16         MR. BERKE: I can ask if he doesn't have a
17 problem giving me the information.
18         MR. SWETNICK: Make a proper demand.
19         MR. BERKE: Okay.  Mr. Guttierrez, you'll be
20 able to find out the information of Javier the
21 accountant and give it to your attorney, correct.
22         MR. SWETNICK: We'll look for it, make a
23 proper demand.
24         MR. BERKE: I'm asking him.
25   Q.    You'll be able to find out his phone number

55

1  American With Disabilities Act?
2     A.   No.
3     Q.   After receiving this complaint, have you
4  contacted anyone to request a quote for replacing the
5  ramp?
6     A.   No.
7     Q.   After receiving this complaint, have you
8  requested anyone to give you a quote, price quote, for
9  what it could cost to demolish this ramp and build a new
10 ramp?
11    A.   No because it's nothing to do with me. This
12 is the building owner. I bought it with a ramp like
13 that. It's not going to be legal. I been there 12, 15,
14 17 years. Nothing happened.
15    Q.   In May 2021, at the front of the store of Gio
16 Wine & Spirits Corp, did you have a buzzer so that
17 someone outside can ring a buzzer to get the attention
18 of a store clerk at Gio Wine & Spirits, at 48-01 108th
19 Street?
20    A.   No.
21    Q.   Is it your opinion that it's not your
22 responsibility to investigate that ramp?
23    A.   Yes. I bought it like that.
24         MR. BERKE: Just give me two seconds, I want
25 to run to the bathroom. We'll take a two minute break.